# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: S.H. :
:
G.H., :
Petitioner : **CASE SEALED**
:
v. : No. 1098 C.D. 2013
: Submitted: December 27, 2013
Department of Public Welfare, :
Respondent :

BEFORE: HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
HONORABLE MARY HANNAH LEAVITT, Judge
HONORABLE ANNE E. COVEY, Judge

OPINION
BY JUDGE LEAVITT FILED: July 24, 2014

G.H. (Father) petitions for review of an adjudication of the Secretary of Public Welfare, which denied Father's request to expunge an indicated report of sexual abuse of his son, S.H. (Child), from the ChildLine Registry. This adjudication was issued upon this Court's remand to the Department of Public Welfare (Department) to consider the evidence in light of this Court's holding that the county must prove the perpetrator's abuse of a child by clear and convincing evidence. On remand, the Secretary edited her earlier adjudication to use the words "clear and convincing" where previously the word "substantial" had been used to describe the evidence and reached the same conclusion she had in the first adjudication. Thereafter, while this appeal was pending, the Supreme Court reversed our holding that the clear and convincing standard of proof governed in an expungement case. Instead, it held that the standard of proof was that set forth in the applicable statute, *i.e.*, "evidence which outweighs inconsistent evidence and

which a reasonable person would accept as evidence to support a conclusion." 23 Pa. C.S. §6303(a). Concluding that the County's evidence was insufficient to satisfy this statutory standard, we reverse.

## Background

On Monday, November 9, 2009, Child's mother, K.Z. (Mother), reported to the "hotline" that her three-year-old son (Child) had been sexually abused by Father one or two days earlier.[1] On January 6, 2010, the County Children and Youth Services Agency (County) named Father as a perpetrator of child sexual abuse in a report it filed with the Statewide Central Register, also known as the ChildLine Registry.[2] The County's indicated report stated that Father denied the abuse; that Father had passed a polygraph administered by the Pennsylvania State Police; and that a "polygraph has been requested for victim's mother and maternal grandmother." Reproduced Record at 3a (R.R. ___). Upon learning of the County's report, Father requested a hearing from the Department to have the County's report expunged from the ChildLine Registry.

The hearing on Father's appeal was held on July 7, 2010. In support of its report, the County presented testimony from Mother, Child, Child's pediatrician and a child psychologist who interviewed Child on one occasion.

---

[1] The Children and Youth Services Agencies of two different counties have been involved in this case. It is not clear whether Mother made the report to County One or County Two. The original investigation and interview of Child was done by County One, but County Two was not satisfied with that interview and directed Mother to seek another interview.

[2] ChildLine, a unit within the Department of Public Welfare, operates a statewide system for receiving indicated and actual reports of child abuse; refers the reports for investigation; and maintains the reports for reference. 55 Pa. Code §3490.4 (definition of "ChildLine"). The ChildLine Registry is maintained in accordance with the Child Protective Services Law, 23 Pa. C.S. §§6301-6386.

2

Child, who was four years old at the time of the hearing, testified about the incident that prompted the County's report. Child stated that Father inserted a finger and a Q-tip into Child's anus during his weekend visit with Father. Ricardo Ilustre, M.D., Child's pediatrician, testified by telephone that he examined Child on November 11, 2009, several days after the alleged incident. During this exam, Child repeated his account of Father's conduct. Dr. Ilustre found no physical evidence of anal insertion nor any basis for Child's abdominal and rectal pain reported by Mother. One month after the visit with Dr. Ilustre, Mother took Child to Susan Nathan, Ph.D., a clinical psychologist in Pittsburgh, who conducted a forensic interview. Dr. Nathan testified by telephone that Child spontaneously stated during her interview of him that "Daddy pokes his finger in my butt." R.R. 85a. Finally, Mother testified. She acknowledged that she and Father were involved in a custody dispute, but she denied giving Child the idea that Father had committed abuse. Mother stated that she learned of the abuse incident from her mother (Maternal Grandmother) on November 9, 2009, the Monday after Child's overnight visit with Father. Maternal Grandmother, who babysits for Child each day, informed her that Child stated that Father had put his finger into Child's anus during the weekend visit.

For his part, Father adamantly denied Child's account, and his denial was corroborated by his mother, N.H. (Paternal Grandmother), who was present during Child's weekend visit with Father. Paternal Grandmother testified that she and her husband (Paternal Grandfather), who lived two hours away, had stayed with Father in his home during Child's weekend overnight visit. Paternal Grandmother testified that she neither saw nor heard anything to support Child's story and stated that Father and Child had not been alone during the weekend. The

3

County stipulated that Paternal Grandfather would corroborate her testimony. Finally, Father presented the testimony of William G. Allenbaugh, MA, CAC, a psychologist and expert in the area of sexual abuse, who testified in person about his psychological testing of Father. Allenbaugh opined that Father did not meet the profile of a sexual abuser or a person who would commit such an act in retaliation against Mother. Father also offered polygraph test reports that had been administered by the Pennsylvania State Police; Father passed but Mother did not.

The Department's administrative law judge (ALJ) recommended the denial of Father's expungement request. The ALJ credited the testimony of the County's witnesses. The ALJ reasoned that the hearing statements of Child and his hearsay statements to Dr. Nathan and Dr. Ilustre constituted "substantial evidence to support [the County's] burden of proof that the indicated report against [Father] is being correctly maintained." R.R. 203a. The ALJ found Father credible, with the exception of his denial of the act of anal penetration of Child, and she made no credibility decisions as to Paternal Grandmother or of Father's expert witness, Allenbaugh. The ALJ admitted the polygraph reports for purposes of appellate review but noted that such reports are generally inadmissible. The ALJ went on to explain that even had she accepted Father's polygraph results as having probative value, her recommendation to deny Father's appeal would not change. R.R. 204a.

Father appealed to the Bureau of Hearings and Appeals (Bureau), and it adopted the ALJ's proposed adjudication in its entirety. Father then sought reconsideration from the Secretary of Public Welfare, which was granted on February 9, 2011, for the resubmission of legal arguments "limited to the facts contained in the record developed before the [ALJ]." R.R. 212a.

4

On August 2, 2011, the Secretary upheld the Bureau. In doing so, the Secretary made additional factual findings, as follows:

37. [Paternal Grandmother] testified in support of [Father]. She stated that she and [Paternal Grandfather] were visiting [Father] and [Child] at [Father's] home during the entire weekend in question. Her testimony indicates that she did not observe anything unusual occurring between [Father] and [Child] and presents a timeline that precludes time for the incident to have occurred.

38. [Paternal Grandmother's] testimony was not credible.

39. [Child's] description of the incident of sexual abuse has been consistent since the initial disclosure which was very shortly after the alleged incident. Over time additional detail has been added, but this is to be expected in a child of three and one-half to four years of age and the additional details have not undermined the elements of the alleged sexual abuse. Therefore, the Subject Child's testimony carries substantial weight.

40. Testimony by the Department's other witnesses, [Mother], Dr. Ilustre and Dr. Nathan was credible, compelling, well balanced and not undermined during cross or by subsequent testimony. This testimony established the consistency of the Subject Child's description of the incident prior to the hearing. Accordingly, this evidence was also given substantial weight.

41. Dr. Allenbaugh testified that he performed a series of tests on [Father] and that no evidence was found to suggest [Father] has a persistent sexual interest in children nor was there evidence of paraphilia in his sexual background. This testimony, while credible and authoritative, is of no probative value. [Father] is not accused of a pattern of interests, behaviors or criminogenic thinking, but of a single incident of inappropriate sexual contact. Dr. Allenbaugh did not offer a specific opinion regarding this alleged offense and as such his testimony cannot be afforded any weight.

5

R.R. 213a.

On March 8, 2013, this Court, on reconsideration, vacated the Secretary's adjudication and remanded the matter to the Department. The remand was necessitated by a ruling from our Court, issued after the Department's proceeding, which held that the standard for such cases is clear and convincing evidence. *See G.V. v. Department of Public Welfare*, 52 A.3d 434 (Pa. Cmwlth. 2012) (*G.V. I*), *reversed*, 91 A.3d 667 (Pa. 2014).[3] After remand, the Secretary issued a new adjudication that replaced her earlier factual findings, which read as follows:

> 37. [Paternal Grandmother's] testimony was credible, except for the timeline that she presented which precludes time for the incident to have occurred.

> 38. The Subject Child's description of the incident of sexual abuse has been consistent since the initial disclosure which was very shortly after the alleged incident. Over time additional detail has been added, but this is to be expected in a child of three and one-half to four years of age and the additional details have not undermined the elements of the alleged sexual abuse. Therefore, the Subject Child's testimony was clear and convincing.

> 39. Testimony by the Department's other witnesses, [Mother], Dr. Ilustre and Dr. Nathan was credible, compelling, consistent, and not undermined during cross examination or by subsequent testimony. This testimony established the consistency of the Subject Child's description of the incident prior to the hearing. Therefore, this testimony was also clear and convincing.

---

[3] In *G.V. I*, this Court held that the county's burden of proof in an expungement appeal is not the "preponderance of the evidence" but, rather, the "clear and convincing evidence" standard. *G.V. I*, 52 A.3d at 446.

40. Dr. Allenbaugh testified that he performed a series of tests on [Father] and that no evidence was found to suggest [Father] has a persistent sexual interest in children nor was there evidence of paraphilia (defined as abnormal sexual behaviors) in his sexual background. This testimony, while credible and authoritative, is of no probative value. [Father] is not accused of a pattern of interests, behaviors or criminogenic thinking, but of a single incident of inappropriate sexual contact. Dr. Allenbaugh did not offer a specific opinion regarding this alleged offense and as such his testimony cannot be afforded any weight.

R.R. 275a-276a. The Secretary substituted the words "clear and convincing" where "substantial" had previously appeared. The Secretary also revised her earlier rejection of Paternal Grandmother's testimony; this time the Secretary found Paternal Grandmother credible, with the exception of "the timeline." Otherwise, the Secretary's adjudication remained unchanged. Father petitioned for this Court's review.[4]

On appeal, Father contends that the Secretary of Public Welfare erred. He argues that the County's evidence consisted of the "inconsistent and incredible" testimony of a four-year-old child, which testimony is not supported by physical evidence. Father also argues that Child's testimony is outweighed by the countervailing evidence, *i.e.*, the expert testimony of the psychologist, Allenbaugh;

---

[4] Our review determines whether constitutional rights were violated, whether errors of law were committed or whether necessary findings of fact are supported by substantial evidence. *P.R. v. Department of Public Welfare*, 759 A.2d 434, 436 (Pa. Cmwlth. 2000). To reach a conclusion of abuse, the "evidence must so preponderate in favor of a conclusion that it outweighs … any inconsistent evidence and reasonable inferences therefrom." *J.S. v. Department of Public Welfare*, 596 A.2d 1114, 1115 (Pa. 1991) (citation omitted). In a sufficiency of the evidence review, the appellate court gives deference to the factfinder, but it must consider all of the evidence presented and decide whether "it is weak or against the preponderance of the evidence." D. Hankinson and R. Thompson, *Standard and Scopes of Review*, 29 THE ADVOCATE (Texas) 6, at 2 (2004).

7

the consistent testimony of adult witnesses that was found credible for the most part; and Father's successful polygraph. Accordingly, Father contends that the County did not make its case. The County counters that Father simply disagrees with the factual findings and credibility determinations made by the ALJ and Secretary, and these findings cannot be disturbed on appeal because they are supported by substantial evidence.

## Standard of Proof

Under the Child Protective Services Law, a county may file an indicated report of child abuse that names a perpetrator of child abuse. 23 Pa. C.S. §6338(a).[5] The indicated report is based solely on the county's investigation.[6] A

---

[5] It states in relevant part:

> When a report of suspected child abuse ... is determined by the appropriate county agency to be … an indicated report, the information concerning that report of suspected child abuse … shall be made in the Statewide central register. Notice of the determination must be given to the subjects of the report, other than the abused child, and to the parent or guardian of the affected child or student along with an explanation of the implications of the determination. Notice given to perpetrators of child abuse and to school employees who are subjects of indicated reports for school employees or founded reports for school employees shall include notice that their ability to obtain employment in a child-care facility or program or a public or private school may be adversely affected by entry of the report in the Statewide central register. The notice shall also inform the recipient of his right, within 45 days after being notified of the status of the report, to appeal an indicated report, and his right to a hearing if the request is denied.

23 Pa. C.S. §6338(a)

[6] In his concurring opinion in *G.V. II*, Justice Saylor wrote as follows:

> I agree with the majority that the statutory preponderance-based standard meets basic due-process requirement. I would only observe that the inquiry into whether the Pennsylvania statute reflects adequate process remains seriously in doubt.

*G.V. v. Department of Public Welfare*, 91 A.3d 667, 676 (Pa. 2014) (*G.V. II*) (Saylor, J. concurring). He quoted also from the *amicus curiae* brief filed by the Pennsylvania State Education Association, which listed "numerous due process irregularities such as the lack of pre-

**(Footnote continued on the next page . . . )**

hearing does not take place unless and until the perpetrator challenges the report. 23 Pa. C.S. §6341(c). There is no administrative pleading that precedes this hearing that identifies the facts the county intends to prove, and there is no pre-hearing discovery. The hearing, where the county bears the burden of production and proof, is conducted by an ALJ appointed by the Department. The ALJ makes recommended findings of fact and conclusions of law, which may be accepted or rejected by the Bureau. From there, either party may seek reconsideration from the Secretary of Public Welfare.

In *G.V. I*, this Court held that a county must prove its case by the clear and convincing evidence standard of proof, as opposed to the preponderance of evidence standard. We explained that this more exacting standard was appropriate because of the indicated report's impact upon an alleged perpetrator's ability to earn a living as well as the "potential loss of reputation and stigma associated with being named a child abuser." *G.V. I*, 52 A.3d at 444.[7] In addition, these cases

---

**(continued . . . )**

[deprivation] notice and hearing, failure to provide a prompt post-determination hearing and the commingling of investigative, prosecutorial and judicial functions when caseworkers who are inexperienced in the law investigate complaints, weigh evidence and judge whether to issue an indicated report." *Id.* at 676 n.2.

[7] The law recognizes three standards of proof: preponderance of the evidence, clear and convincing evidence and proof beyond a reasonable doubt. The "preponderance of the evidence" standard is the lowest of the three standards and means that the fact finder must be satisfied that the evidence shows that a fact is probably true, *i.e.*, more likely true than not. *Agostino v. Township of Collier*, 968 A.2d 258, 269 (Pa. Cmwlth. 2009). Conversely, the "beyond a reasonable doubt" standard is the highest standard of proof and applies to criminal proceedings that impact an individual's liberty interest, an interest worthy of the highest protection. *Commonwealth v. Donough*, 103 A.2d 694, 697 (Pa. 1954). Between these two lies the "clear and convincing" standard of proof. This Court has explained that this standard of evidence requires evidence so "clear, direct, weighty, and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Suber v. Pennsylvania Commission on Crime and Delinquency*, 885 A.2d 678, 682 (Pa. Cmwlth. 2005).

**(Footnote continued on the next page . . . )**

present other evidentiary challenges. The actual abuse may be physically demonstrable but the identity of the perpetrator unknown. The child victim may be too young to understand the abstract concept of truth; may be influenced by an adult; or may be motivated by animus toward the accused perpetrator.

In *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014) (*G.V. II*), our Supreme Court reversed this Court's holding that the County must make its case under the clear and convincing standard of proof. The Supreme Court held that the statutory standard set forth in Section 6303(a) of the Child Protective Services Law governs expunction hearings. 23 Pa. C.S. §6303(a). The concurring opinion of Justice Baer further explained that the statutory standard is the "well-known civil standard of preponderance of the evidence." *Id.* at 679 (Baer, J., concurring). The concurring opinion of Justice Saylor agreed with Justice Baer on this point but cautioned against conflating the statutory standard at 23 Pa. C.S. §6303(a) with the "substantial evidence standard prevailing on appellate review under Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704." *Id.* at 674 (Saylor, J., concurring). He then explained the material difference. The statutory standard incorporates a "weighing dynamic." *Id.* By contrast, "[t]raditional appellate substantial-evidence review … omits all such

---

**(continued . . . )**

Whether the plaintiff's evidence meets the clear and convincing standard is a legal question. Our Supreme Court has explained that

> [a]n appellate court will ordinarily accept as conclusive the findings of fact of a chancellor approved by the court en banc, but this rule is not applicable where the evidence, in order to prevail, must be clear, precise and indubitable or where it must meet some other prescribed standard of proof. *Whether findings are supported by evidence of that quality is always a question of law and therefore reviewable by the appellate court*.

*Stafford v. Reed*, 70 A.2d 345, 346 (Pa. 1950) (emphasis added).

10

weighing – instead, this deferential form of review entails only an examination of whether the evidence, viewed in a light most favorable to the prevailing party, is adequate to support the administrative agency's factual findings." *Id.*

In sum, the standard of proof is preponderance of the evidence, and the statutory standard of evidence in an expunction hearing is

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a). This is the standard that governs our appellate review of the Secretary's adjudication.

It goes without saying that an appellate court may not find facts or reweigh the evidence. *B.B. v. Department of Public Welfare*, 17 A.3d 995, 999-1000 (Pa. Cmwlth. 2011). Nevertheless, whether the County's evidence satisfied the standard set forth in the statute is a question of law. *Kirkwood v. Unemployment Compensation Board of Review*, 525 A.2d 841, 844 (Pa. Cmwlth. 1987). An examination of the evidence presented at the hearing follows.

### The County's Evidence

The County's evidence consisted exclusively of Child's statements made to the ALJ at the hearing and to others before the hearing. There was no physical evidence of abuse, and no witnesses to the alleged abuse. The ALJ found Child, who was three when the alleged abuse occurred and four when he testified, competent to testify. Father was not present during Child's testimony because Child expressed fear of his presence.

Child stated that Father took him to his bedroom, undressed Child and then inserted his finger and a Q-tip "in the hole where my poop goes out." R.R.

11

39a. The Q-tip removed "poop and blood." R.R. 40a. Child said "stop it, stop it, stop it, stop it" but Father "laughed and laughed and laughed." *Id.* Child stated that he first told "the doctors" about the incident, and he told "all the doctors" but no one else. *Id.* He also stated that Mother told him "to tell the truth." R.R. 41a. In response to the ALJ's questioning, Child claimed that Father stated he was taking Child into his room to "hurt" him and that Father then hung him upside down. R.R. 44a-45a. On questioning by Father's counsel, Child stated that Father picked him up by his ankles and dropped him on his head on the floor, which hurt. R.R. 49a. He cried a long time "real loud." *Id.* In quick succession, Child stated that the incident took place in the daytime, in the morning and sometime after lunchtime. R.R. 48a. He also stated that his grandparents were not present in his Father's house the weekend the alleged incident occurred. R.R. 41a-42a.

Next, Mother testified. She reported that Father picked up Child Saturday morning and returned him Sunday evening at approximately 8:00 p.m. She acknowledged that Father had recently petitioned the court to increase his visitation. She explained that she opposed the petition because she did not have confidence in his ability to deal with Child's health problems. Child suffers allergies, and Mother did not believe Father changed Child's diaper often enough or took care to use special detergents on Child's laundry. The day after his visit with Father, Maternal Grandmother reported to Mother that Child was having difficulty urinating and said that "I think it's because of what my dad did." R.R. 57a. Child then told Maternal Grandmother that Father had poked him "really hard in the butt." R.R. 164a. Mother learned of Child's claim when she checked in with Maternal Grandmother by phone during the day. After work, Mother kept a "playdate" scheduled for Child. During this playdate, Child repeated the account

12

to Mother, to Child's friend and the friend's father. Mother called the police and the hotline to report the abuse and scheduled an appointment with Dr. Ilustre. One month later, she took Child to Dr. Nathan on advice of County Two, which was not satisfied with the forensic interview of Child done by the Children and Youth Services Agency of County One. R.R. 60a. Mother denied telling Father that if he ever tried to get custody, she would accuse him of sexual abuse of Child. R.R. 64a.

Dr. Ilustre testified by telephone, relying principally on his medical notes. Given the passage of time, he testified that it would be "hard to say" that he still had "an independent recollection of this visit." R.R. 70a. He stated that Mother brought Child to see him, reporting blood in Child's stool, abdominal pain and rectal pain. R.R. 70a-71a. His x-ray confirmed constipation, which likely explained Child's abdominal pain. Dr. Ilustre testified that, from "what I can remember" Child reported the incident, *i.e.*, Father's insertion of a Q-tip and finger into Child's anus, without prompting from Mother. R.R. 69a. Dr. Ilustre's physical examination did not find blood in Child's stool.[8] The exam found no anal fissures but, to the contrary, good anal sphincter tone. *Id.* Dr. Ilustre found nothing in his physical exam to support Mother's report of Child's rectal pain.

Finally, Dr. Nathan testified. She discussed the difficulty in interviewing three-year-olds, who deal in the concrete not the abstract. R.R. 79a. She explained the steps she takes to rule out coaching. R.R. 80a-82a. She found Child to be bright, happy and pleasant. In response to her remark about "daddies,"

---

[8] Presumably, Dr. Ilustre conducted a rectal examination of Child because there is no other way to rule out blood in the stool. He did not testify whether Child made his statement about Father before or after Dr. Ilustre's examination of Child's rectum or whether Dr. Ilustre himself used a Q-tip to check for blood in Child's stool.

Child stated he had a "Bops," which referred to his maternal grandfather. R.R. 85a. Child then stated, spontaneously, "Daddy pokes his finger in my butt." *Id.* On follow up questioning by Dr. Nathan, Child stated that Father also used a Q-tip. Child told Dr. Nathan that "[i]t was the truth," several times. R.R. 88a. On cross-examination, Dr. Nathan acknowledged that Child did not say that Father picked him up by the heels and dropped him. She also acknowledged that her written report stated that Child's sexual abuse account might not be complete. Finally, she conceded that it was possible that "Child is simply telling a story." R.R. 95a.

**Father's Evidence**

Father's case consisted of expert testimony, offered to rule out a sexual interest in children by Father or any inclination to antisocial behavior. Father also offered testimony from those present during Child's overnight visit on November 7, 2009, when the alleged incident of sexual abuse occurred, according to Mother's report to the hotline.

William G. Allenbaugh is a psychologist who specializes in evaluating and treating sex offenders. He does assessments for Children and Youth Services in a number of counties and works for the Pennsylvania Board of Probation and Parole. He saw Father on referral from Dr. Allen Ryen, another psychologist, to determine whether Father posed a risk to Child.[9] R.R. 100a. Allenbaugh did a clinical interview and then did two tests: the "Affinity Assessment of Sexual Interest" and the "Clarke Sexual History Questionnaire." R.R. 101a. These tests are designed to determine, beyond the subject's awareness, the subject's sexual

---

[9] Father testified that he and Child met with Dr. Ryen for one counseling session that did not go well because Child announced at the outset, "I hate you, Daddy" and refused to talk during the session about the alleged incident. R.R. 129a-130a.

interest in various age groups. It can determine whether a subject is denying an actual interest. Allenbaugh then used the Jesness Inventory to look for "criminogenic thinking." R.R. 102a. Within a reasonable degree of professional certainty, Allenbaugh opined that Father did not have a sexual interest in children and was not prone to antisocial, or criminogenic, behavior. Allenbaugh was familiar with the work of Trooper Davis of the Pennsylvania State Police, who administered Father's polygraph test. Allenbaugh explained that he uses polygraphs in his work and that child service agencies in Pennsylvania also use them in their investigations. On cross-examination, Allenbaugh denied that Father could manipulate the tests that Allenbaugh administered. He explained that the tests measure visual reaction to slides and do not rely on the subject's spoken responses. Allenbaugh stated that the tests he did on Father are routinely admissible in court proceedings. On redirect, Allenbaugh again stated that his testing also ruled out an "antisocial pathway," which might prompt a person to commit sexual abuse in retaliation. R.R. 110a.

Next, Paternal Grandmother testified. She explained that she and her husband arrived at Father's home on Saturday morning between 10:00 and 11:00 a.m., shortly before Father arrived with Child. The group went to a playground; went to the store; and had lunch. In the afternoon, Father and Child played and then napped "on the couch." R.R. 115a. After supper, Paternal Grandmother helped Father give Child a bath upstairs and put him to bed. Sunday followed an equally unremarkable routine. The visit concluded with a dinner at the home of Father's girlfriend. After dinner, Paternal Grandmother and Grandfather left for their home in another state, and Father took child back to Mother's house. Paternal Grandmother stated that she left the house at some point Sunday afternoon to do

15

errands but her husband stayed at the house doing work on his computer. Paternal Grandmother testified that Father did not take Child upstairs other than to bathe him and put him to bed Saturday night in his own room. R.R. 117a. At no point did she hear Child crying in a loud voice, and she observed nothing unusual in Child's behavior all weekend. She described the relationship between Father and Child as "tremendous" and noted that Child hugged and kissed them all when they separated Sunday evening. R.R. 114a, 117a.

Last to testify was Father, who is a school teacher. He explained that during his marriage to Mother, they rented a house owned by her parents, who lived close by. Maternal Grandmother has provided daycare for Child since his birth, while Father and Mother worked, and continues to do so. After the divorce, Father had Child with him on Wednesdays and every other weekend, for the day. A dispute developed when Father filed a petition to expand his visitation rights. In 2008, Mother told him that if he ever tried to get custody, she would accuse him of inappropriately touching Child. R.R. 125a. The 2008 dispute was temporarily resolved when Father gained increased visitation. In week one, Father saw Child on Wednesdays and then the following Saturday for overnight. In week two, Father saw Child Tuesday and Thursday but not the weekend. R.R. 126a. However, Father wanted to expand the length of his weekend visit from Friday to Sunday so that he could take Child to visit his parents, who lived two hours away in another state. R.R. 136a. To that end, he filed a petition with the court, which was pending at the time the alleged abuse occurred. Father discussed his proposed expanded visitation with Mother the evening of November 8, 2009, when he returned Child.

Father denied Child's accusation that he had penetrated Child's anus, ever. However, Father could see some elements of truth in Child's story. For example, Father, with Paternal Grandmother, did undress Child, but it was for his night time bath.[10] After the bath, Father applied an ointment to a rash on Child's buttocks before putting him into his pajamas, in accordance with Mother's instructions. In fact, Father discussed the rash with Mother when she called Saturday evening to say goodnight to Child. R.R. 132a-33a. Child suffers allergies, and Father explained that he uses a Q-tip to remove mucous from Child's nose, also instructed by Mother. Father testified that in every other respect Child's story was not true. He did not threaten to hurt or actually hurt Child; did not drop him from an upside down hanging position; did not laugh while Child cried; and did not insert anything into Child's anus.

Father stated that his job as a school teacher is in jeopardy. Likewise, his relationship with Child is in jeopardy; his shared custody has been suspended since the alleged incident. Mother refuses to allow supervised visits. Father had no knowledge, only suspicions, of what caused Child's newly developed fear or dislike of him, and he declined to voice his suspicions at the hearing.

Finally, Father offered into evidence two polygraph reports conducted by Trooper Kenneth Davis of the Pennsylvania State Police. Father's polygraph was done on December 28, 2009, and it showed "no deception" in response to questions about the alleged abuse. R.R. 179a. Mother's polygraph was done on January 16, 2010, and it showed "deception indicated" when stating that she did not coach Child and was not aware of anyone who did. R.R. 176a. According to State Police report, Mother had "mentioned" to Father the possibility of his

---

[10] Both Paternal Grandmother and Father described the Saturday night bath as a playful time.

relinquishing parental rights in exchange for not paying child support, but she denied threatening to accuse him of sexual abuse. *Id.*

### Analysis

As noted, in an expunction proceeding, the evidence to support the conclusion, whether the conclusion is to expunge a report or not to expunge, must outweigh inconsistent evidence and be evidence "which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). Father argues that the evidence relied upon by the ALJ and the Secretary did not meet this statutory standard. He also argues that the evidence does not meet the clear and convincing standard of proof. In light of our Supreme Court's recent holding in *G.V. II*, we consider the first argument but not the second.

Child's testimony does not contain the type of information that in itself supports sexual abuse. For example, Child did not provide information that is generally outside the knowledge of a young child and could be learned only as a result of sexual abuse. In *In re E.A.*, 82 A.3d 370, 372 (Pa. 2013), a four-year-old girl played with a doll's head near her vaginal area in a way that demonstrated knowledge atypical for a child that age. Likewise, in *D.W. v. Department of Public Welfare*, (Pa. Cmwlth., No. 922 C.D. 2013, filed March 11, 2014), slip op. at 5-6, a six-year-old girl made an anatomically correct drawing of a penis, demonstrating knowledge not expected for a child that age.

The ALJ and the Secretary explained that they found Child's testimony to be credible because it was corroborated, in part, by Child's out-of-court statements to Dr. Ilustre and to Dr. Nathan. Because Dr. Ilustre and Dr. Nathan testified by telephone, the ALJ did not have the opportunity to consider either one's demeanor. Where a fact finder has not seen the witness testify and

18

cannot assess witness demeanor, a mere conclusion on credibility is inadequate. *See Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1053 (Pa. 2003) (establishing that a workers' compensation judge must articulate an "objective basis for the credibility determination" of an expert who testifies by deposition in order to permit effective appellate review). The ALJ did not provide any explanation for crediting the telephone testimony of Dr. Ilustre and Dr. Nathan on its substance.

Dr. Ilustre found no physical evidence of anal penetration and, specifically, no evidence of penetration that would cause bleeding. Further, Dr. Ilustre testified from his notes and was candid about his lack of memory; he was equivocal about whether Child spoke spontaneously of the incident. Dr. Ilustre's testimony is more supportive of Father than of the County.

By the time Child spoke to Dr. Nathan, he had told the story of abuse to Maternal Grandmother, to Mother, to a friend, to the friend's father and to an interviewer at County One's Children and Youth Services. The story was firmly implanted in his memory, whether by suggestion or mistake. Truthfully repeating a memory does not mean the memory is based on experience, as opposed to the suggestion of another person or a complete fabrication.

Child first related the incident to Maternal Grandmother, a critical witness who did not testify. There is no evidence that the County even interviewed her, and it is not known whether Maternal Grandmother ever complied with the County's reported request for a polygraph. There is a discrepancy in the record about where and when Child first reported the abuse to Maternal Grandmother. Mother testified that Maternal Grandmother told her that Child said it on the porch. Dr. Nathan's report stated that Maternal Grandmother was in the middle of a

19

telephone conversation when Child made the statement and "put the phone down momentarily in order to attend to [Child]. The person on the other end of the line overheard [Child's] disclosure." R.R. 165a. It is not known whether the person on the call was ever interviewed by the County.

The ALJ found "no evidence of improper interview techniques, or suggestive questioning or that interviewer bias may have influenced the subject child to such a degree [that Child's testimony] was irreparably compromised." R.R. 204a. It can be assumed that Dr. Nathan used state-of-the-art interview techniques. But this does not rule out coaching of Child by others in advance of her interview or, as Dr. Nathan herself acknowledged, that Child made up the story.

The ALJ found, as fact, that an "unidentified person spoke with subject child prior to the hearing and told subject child he would be asked questions about [Father]." R.R. 196a. She inferred this pre-hearing conversation from Child's statement that "my dad didn't tell the truth." R.R. 29a, 196a. The ALJ also found the relationship between Father and Mother to be "acrimonious." *Id.* More remarkably, the ALJ found, as fact, that in 2008, Mother threatened to file a sexual abuse claim if Father tried to seek custody, rejecting Mother's denial of making this threat. In spite of these specific findings, the ALJ fully credited Child's testimony, without limitation.

The Secretary found Paternal Grandmother credible, "except for the timeline that she presented which precludes time for the incident to have occurred." R.R. 275a. The Secretary did not observe Paternal Grandmother testify. She offered no explanation for any of her credibility determinations for

20

any of the fact or expert witnesses whose testimony she reviewed solely on the transcript. *Cf.*, *Daniels*, 828 A.2d at 1053.

Paternal Grandmother testified that she and Paternal Grandfather spent the entire weekend with Father and Child. From the time they arrived on Saturday morning to their separation Sunday evening, she saw or heard nothing that would support Child's story. His behavior was normal and happy. The County stipulated that the testimony of Paternal Grandfather would corroborate the testimony of Paternal Grandmother. The ALJ made no finding on Paternal Grandmother's credibility, but the Secretary found her credible with the exception of her proffered "timeline." R.R. 275a. This conclusory statement does not specify what part of Paternal Grandmother's timeline was rejected or when the Secretary believes Father had the opportunity to commit the act of abuse outside the presence of his parents. Further, the Secretary's finding cannot be reconciled with Paternal Grandmother's statement, which was credited by the Secretary, that Child did not yell or at any time cry "real loud" but was happy during the weekend. In short, the Secretary's elliptical finding on Paternal Grandmother's credibility, which is neither complete nor logical, defies meaningful appellate review.

Allenbaugh opined, with a reasonable degree of psychological certainty, that Father lacked a sexual interest in children or a criminogenic pathway to physical abuse. The Secretary found this opinion to be "credible and authoritative." R.R. 213a. However, the Secretary assigned his opinion no weight because he did not opine, specifically, that Father did not commit the specific alleged act of sexual abuse. Experts do not testify to the ultimate question of fact in any civil proceeding. *Kozak v. Struth*, 531 A.2d 420, 422 (Pa. 1987). Allenbaugh's "credible and authoritative" testimony was probative and relevant

21

under PA. R.E. 401[11] and entitled to some weight; the Secretary's stated reason for rejecting this expert testimony lacks legal merit.

Finally, Father argues that the Secretary erred by ignoring the results of the polygraph examinations, which Father passed and Mother failed. Mother's polygraph stated "Deception Indicated" when she stated that she had not "coached" Child to "say those things about [Father]." R.R. 176a. Father's polygraph stated "No Deception Indicated" when he stated that he did not do "anything sexual to [Child]." R.R. 179a. The ALJ marked the polygraph reports and included them in the record and admitted them "for [appellate] review." R.R. 17a.[12] Notably, the District Attorney relied, at least in part, on the results of Father's polygraph and has advised Father, in writing, that criminal charges will not be filed. R.R. 128a.

In *Commonwealth v. Gee*, 354 A.2d 875, 883 (Pa. 1976), our Supreme Court stated "the scientific reliability of polygraph tests had not been sufficiently established." It also stated that courts should be "alert to developments in this field." *Id.* at 884. The rules of evidence are relaxed in administrative proceedings, and there is no fixed rule on the admissibility of polygraph tests in such proceedings. *See Commonwealth v. A.R.*, 80 A.3d 1180 (Pa. 2013) (holding that polygraph results were admissible for some purposes in a probation violation

---

[11] It states:

> Evidence is relevant if:
> - (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
> - (b) the fact is of consequence in determining the action.

PA. R.E. 401.

[12] The ALJ stated at the hearing "we, the Bureau, had a memo on polygraphs because we're really not sure what to do; but we do mark them and admit them for the purpose of the [appellate] review just as part of the record but not for any kind of finding of fact. So I'll do that in this particular case." R.R. 17a. Counsel for the County objected to the admission of the results.

hearing). In short, the ALJ erred in assuming that polygraph tests results are universally inadmissible evidence. The ALJ compounded this error by stating that, even so, were she to assume the reliability of Father's polygraph test, she would not change her recommendation. She offered no reasons for this position.

We return, then, to Child's testimony, on which the factual finding of sexual abuse was made against the contradictory evidence of adults present when the incident allegedly occurred. To meet the statutory standard, Child's testimony must be of such a quality to allow the fact finder to conclude that it outweighs "inconsistent evidence." 23 Pa. C.S. §6303(a).

On questioning by the County, the Child stated as follows:

Q: Do you ever go visit your father?

A: No, not anymore because he has been bad to me.

Q: Your dad has been bad to you? Is that what you said?

A: Uh-hmm.

Q: How has your father been bad to you?

A: He got his finger and poked it in my butt, and it hurt.

Q: He got his finger, and he poked it in your butt; and it hurt? Is that what you said?

A: Uh-hmm. That's true.

Q: Say that again.

A: That's true.

Q: Where did this happen?

A: At my dad's house when I was in his bed.

Q: At your dad's house on his bed?

A: Uh-hmm, in his bedroom.

23

R.R. 35a-36a.  When asked how that felt, Child responded, "It feels like it was bad."  R.R. 36a.  Upon more questioning, the County got Child to make statements about the Q-tip.

> Q:  Did [Father] just use a finger, or did he –
>
> A:  No.  He got a Q-tip and put it in my butt, and it really, really hurt.
>
> Q:  He got a Q-tip and put it in your butt, and it really, really hurt?
>
> A:  Uh-huh.

*Id.*

This testimony, elicited by some leading questions, became the centerpiece of the ALJ's findings of fact that Father abused Child.  The ALJ relied on Child's testimony that described the abuse and capriciously disregarded the remainder of Child's testimony, some of which was wrong or unreliable.  Under the statutory standard, the ALJ's job was to consider Child's testimony as a whole and consider whether its quality was such that it outweighed the evidence presented by Father.  Instead she relied upon selective portions of his testimony.  The ALJ recognized that Child demonstrated signs of pre-hearing coaching, but then made no attempt to reconcile this observation with her decision to base the conclusion of abuse solely on Child's testimony.

Taken as a whole, Child's testimony has mistakes and is incomplete.  At one point Child said the abuse took place in the morning and shortly thereafter he said after lunchtime.  He denied that his grandparents were present that weekend, which was plainly erroneous, according to other credited testimony.  More troubling is Child's statement that Father held him upside down and dropped him on his head.  Such an incident would have caused bruising, but it was not reported by Dr. Ilustre.  Such an act would have caused a major uproar.  Indeed,

24

Child reported crying very loudly. However, Paternal Grandmother heard no crying and reported that Child was his normal happy self the entire weekend; this part of her testimony, which does not relate to a timeline, was credited by the Secretary.

The two credited accounts of the weekend given by Child and by Paternal Grandmother cannot be reconciled. The Secretary brushed aside Child's new allegation of abuse as a mere detail. Having a child dropped to the floor upside down is not a "detail" but is a new and different instance of abuse. Simply crediting all of Child's testimony does not give it the quality needed to meet the statutory standard of proof.

The ALJ found that Child had been coached before the hearing by someone. This finding can be seen at several points in the hearing, not just the one cited by the ALJ. Child testified that he had to visit Father because Mother "married him," because Father promised he would be "good." R.R. 43a. However, Father "didn't do it." *Id.* These statements were learned from another person because there is no other way for Child to know why Mother married Father and why their marriage did not work. Likewise, Child stated that he first told "the doctors" and only the doctors about the incident, not Mother and not Maternal Grandmother. R.R. 40a. This statement is not accurate, according to Mother's own testimony. Child makes repeated references to "the truth" in his testimony, but Dr. Nathan testified that children his age deal in the concrete, not the abstract.

Where a claim of sexual abuse is based solely upon victim testimony and there is no physical or other objective evidence of abuse, the County should be prepared to eliminate other explanations for the victim's story. This requires a

25

thorough investigation. In the case of a young child, this should include an interview of the first adult to whom the child made the statement of abuse. The County should have interviewed all the people named by Mother as having heard Child's account. This includes Maternal Grandmother, to whom Child first reported the claim of abuse. Inexplicably, the County did not present any evidence about its handling of this case, beginning with its investigation. It did not explain why its report to the ChildLine Registry included the statement that Father passed a polygraph but, nevertheless, found him to be a perpetrator. It did not explain why it rejected Child's interview by County One's Children and Youth Services.

Child's account was not corroborated by any physical evidence. This is not a requirement to meet the statutory standard, but its absence means that Child's testimony must, as the statute requires, be of the quality that it "outweighs inconsistent evidence." 23 Pa. C.S. §6303(a). Child's testimony revealed that he knows where "poop" goes out, but this is not knowledge acquired only in the course of sexual abuse. Child was unclear on the time of day of the event and was wrong in his statement that his grandparents were not present in Father's house during the weekend that this incident occurred. Some of these descrepancies are mere details, but others are not. Child's testimony lacks the quality needed to "outweigh inconsistent evidence" or to be accepted by a reasonable person as supporting the conclusion of abuse. 23 Pa. C.S. §6303(a).

## Conclusion

Accepting all the credibility determinations made by the ALJ and Secretary and allowing all reasonable inferences from Child's testimony, we cannot conclude, as a matter of law, that Child's testimony outweighed the inconsistent evidence, which for the most part was also credited by the ALJ and the

26

Secretary. Accordingly, we reverse the Secretary's adjudication and direct the expunction of G.H.'s indicated report from the ChildLine Registry.[13]

_____
MARY HANNAH LEAVITT, Judge

Judge Leadbetter concurs in the result only.

---

[13] As explained in *G.V. I*, 52 A.3d at 447, the information in an indicated report, which is removed from the ChildLine Registry, is maintained in Department's files, as are complaints, and may be accessed by law enforcement officials and specified Department employees.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: S.H.              :
                            :

G.H.,                   :

          Petitioner        : **CASE SEALED**
                            :

          v.                     : No. 1098 C.D. 2013
                            :

Department of Public Welfare,    :
          Respondent       :

## O R D E R

AND NOW, this 24th day of July, 2014, the order of the Department of Public Welfare, dated June 5, 2013, in the above-captioned matter is hereby REVERSED, and G.H.'s indicated report is ordered to be removed from the ChildLine Registry.

_____
MARY HANNAH LEAVITT, Judge