# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

S.H.,                                           :
                 Petitioner                     :
                                                :      **CASE SEALED**
          v.                                    :      No. 535 C.D. 2019
                                                :      Submitted: October 25, 2019
Department of Human Services,                   :
                 Respondent                     :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY PRESIDENT JUDGE LEAVITT                       FILED: February 18, 2020

S.H. (Father), *pro se*, petitions for review of an adjudication of the
Pennsylvania Department of Human Services, Bureau of Hearings and Appeals
(Department), that denied Father's request to expunge an indicated report of abuse
of his daughter, A.H. (Child), from the ChildLine and Abuse Registry (ChildLine).[1]
Father argues that the Department erred in holding that his actions were reckless and,
thus, constituted child abuse under the Child Protective Services Law (Law).[2] Upon
review, we reverse.

The following facts are undisputed. Child was 18 months old at the
time of her death on March 11, 2018. On the night of March 10, 2018, Father's sister
supervised Child and placed her in a crib in Father's basement bedroom to sleep
before she went upstairs to sleep. Father returned home from work between 3:30

---

[1] ChildLine, a unit within the Department, operates a statewide system for receiving reports of
suspected child abuse; refers the reports for investigation; and maintains the reports for reference.
55 Pa. Code §3490.4.

[2] 23 Pa. C.S. §§6301-6386.

a.m. and 4:30 a.m. on March 11, 2018, and went to the basement bedroom to sleep. Between 8:45 a.m. and 10:00 a.m., Father and Child were awake and ate breakfast. Sometime between 10:00 a.m. and noon, while Father fell back to sleep, Child pulled a key lanyard out of a laundry basket that was on a chair. Child then looped the lanyard around her neck and strangled herself by hanging on the lanyard in a near-prone position.

Upon awaking and finding Child unresponsive, Father cried out and carried Child upstairs to perform cardiopulmonary resuscitation (CPR), while his sister called 911 for assistance. Child was later pronounced dead. The County Coroner's Office ruled that Child died from accidental passive strangulation. Certified Record (C.R.), Item 3, Exhibit A-1, at 1.

The same day, the County Children and Youth Services (CYS) received a referral about child abuse related to Child's death. After investigation, CYS filed an indicated report with ChildLine listing Father as a perpetrator of child abuse for "fail[ing] to adequately supervise [C]hild." C.R., Item 3, Exhibit C-3, at 2. The report stated that "the criteria for Causing Serious Physical Neglect of a Child and Causing the Death of Child through any Act/Failure to Act has been met." *Id*.

Father appealed. The Department appointed an Administrative Law Judge (ALJ) to conduct a hearing, which took place on November 29, 2018. CYS presented testimony from a police detective (Detective) and a CYS caseworker (Caseworker). Detective testified that he responded to the scene on March 11, 2018, and authored the police report, which was submitted into the record. Detective described the basement bedroom as follows:

> [I]t was a smaller room with a fairly large bed, a television, an easy chair and a crib in the corner. And it was very – I'd consider it cluttered. There was not a lot of area available for a child to

2

play. If [C]hild was not in the crib, there were a few hazards in that some of the drawers did not have safety locks on. I believe there was a knife on top of the dresser. [Father] did have a gate up to prohibit [C]hild from going back behind the television area where all the wires were. But there w[ere] not gates everywhere else in this little room.

Notes of Testimony, 11/29/2018, at 31 (N.T.__). Detective stated that he "saw the possibility of [Child] getting behind [the gate] barrier." N.T. 80.

Detective testified that the seat of the chair with the laundry basket was 23 inches off the floor; Child, 32 inches tall, was eye level with the lower portion of the basket when standing. The hole in the basket was about an inch-and-a-half wide; the keys became "wedged in" when Child pulled out the lanyard through the hole. N.T. 52. The basket contained laundry and other items. Detective did not believe Child had enough strength to pull the basket off the chair or pull the keys through the hole. Detective testified that Father told him during the interview that the laundry basket had sat on the chair for weeks. Father also told Detective that Child "had played with [the lanyard] at least two times." N.T. 64. Each time Father tucked the lanyard back into the basket.

Detective testified that the District Attorney reviewed the evidence and decided not to charge Father. In his 26 years of service, Detective had not encountered a case "involving a lanyard that strangled a child." N.T. 59. He had encountered strangulation by a window blind or crib.

Caseworker testified that she worked at CYS for three years as an intake caseworker and a screener. She did not meet with the law enforcement officers who investigated the case. She listened to the interview recordings; reviewed case notes by another caseworker who responded to the scene; and watched a video recording of the house. She described the bedroom as follows:

3

a baby gate that was across where the bed was, protecting from [C]hild to be able to go behind the TV or where the TV area is. Additionally there [were] locks on one of the dressers. The taller dresser in the bedroom didn't have locks from what I was able to see through the DVD. It was a very higher [sic] dresser that [C]hild wouldn't be able to access the top of…. There was clutter on the floor of clothing and those things. I didn't see any hazardous materials on the floor.

N.T. 100.

Caseworker opined that Father's inadequate supervision caused the Child's death. She testified as follows:

[Counsel]: Can you explain what the agency concluded was inappropriate about the supervision provided at that point in time, resulting in [C]hild's death.

[Caseworker]: Ultimately on 3/11/2018 [Father] had fallen asleep and stated that he had last seen 10:00 a.m. on his cable box. And woke up at appropriately 12 o'clock and found the [C]hild. The agency … observing the videotapes and the recorded interviews determined that [Father's] egregious failure to supervise his child resulted in [C]hild's death. The agency isn't saying that [Father] intentionally caused [Child's] death. However, recklessly and knowingly his awareness of the lanyard had resulted in [C]hild's death.

[Counsel]: What was reckless about the situation?

[Caseworker]: [Father] had reported that [Child] had went after the lanyard on two different occasions and he would tuck the lanyard back in. Additionally he reported that the laundry basket holding the lanyard with more weight on top – I believe it was a computer that was on top of the laundry basket…. He had been aware of the laundry basket on his couch for approximately three months and did not make means to remove that. A child at the age of one has a habit of grabbing things and getting into things and learning different things.

4

N.T. 101-02. Caseworker stated that she had not encountered a case of strangulation by a lanyard in her past investigations or learned of such a possibility in her training.

Father also testified about the incident. He acknowledged that he had fallen asleep around 10:00 a.m. on March 11, 2018, while Child was on the floor of the bedroom with the television playing children's shows.

> [Counsel]: Have you done this before, fallen asleep with [Child] in your room with you?
>
> [Father]: I have. Normally though before if I thought that I was going to fall asleep or intentionally fall asleep she either would have been with someone else or back [] in her pack and play.
>
> [Counsel]: And that's – the someone else would be your sister, who lives upstairs?
>
> [Father]: That's correct.

N.T. 131. Father also testified that he allowed Child to play "outside of the pack" so that "[Child] can entertain herself and stay quiet so [he] can sleep." N.T. 146-47.

Father recalled seeing Child play with the lanyard on two prior occasions when it was hanging on the wall. N.T. 147. He did not recall her playing with it when it was in the laundry basket. *Id.* When counsel for CYS suggested this testimony was inconsistent with Detective's recollection of Father's interview, where Father stated he had tucked the lanyard back into the basket on two occasions after Child pulled on it, Father responded that he was "probably misquoted or misunderstood." *Id.* Father testified that Child could not open the drawers of the dresser because they were heavy and did not slide easily. The knife and other items on top of the dresser were inaccessible to Child. Father acknowledged that there was a radio charger on the bed and that Child had climbed onto the bed "a couple times." N.T. 139. However, he believed that Child could not get past the child gate,

5

which he set up to prevent her from accessing the computer and the television, which he thought were hazards. N.T. 142

The ALJ recommended denying Father's appeal. He found that Detective and Caseworker's credible testimony constituted substantial evidence that Father "recklessly and egregiously failed to adequately supervise [C]hild on March 11, 2018," resulting in Child's death. ALJ Decision at 9. He credited Father's testimony, except for the part where he denied knowledge of Child pulling the key lanyard out of the laundry basket on two occasions. The ALJ concluded that Father's inadequate supervision constituted "serious physical neglect of a child" which, in turn, is "child abuse" under Section 6303(b.1) of the Law, 23 Pa. C.S. §6303(b.1). ALJ Decision at 8.

To reach this conclusion, the ALJ found, as fact, that the bedroom contained a number of risks, such as the laundry laying on the floor; the radio charger on the bed; electrical cables, electric outlet and power cords in the computer area; and the television. The ALJ further found that Child could get around the child gate by going over or under Father's bed. ALJ Decision at 3; Finding of Fact No. 8. The ALJ thus reasoned:

> [Father] allowing [Child] to be exposed to these hazards for nearly two (2) hours while he slept was extremely and remarkably poor judgment as it exposed [C]hild to these known health and safety dangers, which is why he sought to prevent her accessing the computer area. [Father] choosing to sleep while [C]hild remained loose in the bedroom was consciously done with a disregard of the known substantial and unjustified choking, electrocution, and crush risks to [C]hild and his disregard of these hazards to [C]hild involved a gross deviation from the standard of conduct that a reasonable person would have observed in [Father's] situation.

ALJ Decision at 9. On November 7, 2019, the Department adopted the ALJ's proposed adjudication in its entirety. Father then petitioned for the Court's review of the Department's adjudication.

On appeal,[3] Father argues that the Department erred in holding his conduct to be "reckless or egregious in nature." Father's Brief at 8. He contends that he "did not choose to sleep while [C]hild remained loose." *Id*. at 7. He argues that the record did not support the ALJ's finding that he "willingly or consciously put [his] own child at risk," or that substantial risks existed in the bedroom on the date of the incident. *Id*. CYS counters that Father acted recklessly on the day of Child's death, as shown by allowing Child to roam around the bedroom so that he could sleep.[4]

Section 6341(a)(2) of the Law authorizes "the [S]ecretary to … expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with [the Law]." 23 Pa. C.S. §6341(a)(2). "[T]he proper inquiry into whether an indicated report of child abuse should be expunged is whether the report is accurate." *B.K. v. Department of Public Welfare*, 36 A.3d 649, 653 (Pa. Cmwlth. 2012). CYS bears the burden of showing that the

---

[3] "This Court's review is limited to determining whether legal error has been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence." *T.H. v. Department of Human Services*, 145 A.3d 1191, 1196 n.6 (Pa. Cmwlth. 2016) (quoting *F.R. v. Department of Public Welfare*, 4 A.3d 779, 782 n.7 (Pa. Cmwlth. 2010)). "In child abuse expunction proceedings, the [Bureau of Hearings and Appeals], as the [Department] Secretary's designee, is the ultimate finder of fact, and the ultimate arbiter of the weight to be assigned to the evidence presented." *Beaver County Children & Youth Services v. Department of Public Welfare*, 68 A.3d 44, 47 n.4 (Pa. Cmwlth. 2013). Nevertheless, whether a county agency's evidence satisfied the evidentiary standard set forth in the statute is a question of law. *In re S.H.*, 96 A.3d 448, 455 (Pa. Cmwlth. 2014).

[4] The Department notified this Court that it would not be filing a brief in this matter because CYS's brief adequately addresses the issue.

indicated report of abuse is accurate and is consistent with the Law. *T.H. v. Department of Human Services*, 145 A.3d 1191, 1198 (Pa. Cmwlth. 2016); 23 Pa. C.S. §6341(c).

An indicated report is issued by a county agency or the Department if, after an investigation, "'substantial evidence' of the alleged abuse exists based on available medical evidence, the child protective service investigation, or an admission of the facts of abuse by the perpetrator." *G.V. v. Department of Public Welfare*, 91 A.3d 667, 671 (Pa. 2014) (quoting 23 Pa. C.S. §6303(a)). Section 6303(a) of the Law defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). The "substantial evidence" standard set forth in Section 6303(a) of the Law is "the equivalent of the preponderance of the evidence standard." *T.H.*, 145 A.3d at 1198.

The Law defines "child abuse" as follows:

The term "child abuse" shall mean *intentionally, knowingly or recklessly* doing any of the following:

\*\*\*

(7) Causing serious physical neglect of a child.

\*\*\*

(9) Causing the death of the child through any act or failure to act.

23 Pa. C.S. §6303(b.1) (emphasis added). Section 6303(c) of the Law recites the requirement for finding an individual culpable of child abuse as follows:

Conduct that causes injury or harm to a child or creates a risk of injury or harm to a child shall not be considered child abuse if there is no evidence that the person acted intentionally,

8

knowingly or recklessly when causing the injury or harm to the child or creating a risk of injury or harm to the child.

23 Pa. C.S. §6303(c). In the case *sub judice*, Child was strangled by the key lanyard she pulled from the laundry basket. The Department concluded that Father was reckless because he disregarded the substantial risks to Child's safety that existed in the bedroom. The question here is whether the Department correctly applied the law to the facts, which are not disputed in any material way.

Section 6303(a) states that the term "recklessly" "shall have the same meaning as provided in 18 Pa. C.S. §302 (relating to general requirements of culpability)." 23 Pa. C.S. §6303(a). In turn, Section 302(b)(3) of the Crimes Code states as follows:

> A person acts recklessly ... when he *consciously disregards* a *substantial and unjustifiable risk* that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation*.

18 Pa. C.S. §302(b)(3) (emphasis added).

The key terms, "consciously disregard," "substantial and unjustifiable risk," and "gross deviation" are not defined in either the Crimes Code or the Law. Accordingly, they must be construed in accordance with "their common and approved usage." 1 Pa. C.S. §1903(a).

Merriam-Webster's Collegiate Dictionary defines "risk" as the "possibility of loss or injury: PERIL[.]" MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1008 (10th ed. 2001). "Substantial" is defined as "not imaginary or illusory: REAL, TRUE[.]" *Id*. at 1170. While "unjustifiable" is not separately

9

defined, Merriam-Webster's defines "justifiable" as "capable of being justified: EXCUSABLE." *Id*. at 635. In the context of Child's death, the "substantial and unjustifiable risk" would be the real possibility that Child would sustain a bodily injury from the hazards then existing in the bedroom or from Father's conduct. 18 Pa. C.S. §302(b)(3).

As to the term "consciously disregards," Merriam-Webster's defines "conscious" as "perceiving, apprehending, or noticing with a degree of controlled thought or observation." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 245. "Disregard" is defined as "to pay no attention to: treat as unworthy of regard or notice." *Id.* at 335. To act "recklessly," Father had to have perceived, but purposely ignored, the substantial and unjustifiable risk to Child that would result from the hazards existing in the bedroom or from his conduct. 18 Pa. C.S. §302(b)(3).

Finally, Merriam-Webster's defines "gross" as "immediately obvious[;] … glaringly noticeable usu[ally] because of inexcusable badness or objectionableness." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 513. "Deviation" is defined as "noticeable or marked departure from accepted norms of behavior." *Id.* at 316. To act recklessly, Father had to have "glaringly" departed from the accepted norms, *i.e.*, what a reasonable person would find acceptable in the same circumstances. 18 Pa. C.S. §302(b)(3).

Here, Child was strangled by the lanyard she pulled from the laundry basket. CYS's witnesses did not show that the lanyard represented a "substantial risk" to Child. 18 Pa. C.S. §302(b)(3). To the contrary, both Detective and Caseworker testified that they had never encountered a case of strangulation by a lanyard in either their professional experience or training. The ALJ found that Father had tucked the lanyard back into the basket after each instance Child pulled it out.

10

This action, by itself, does not demonstrate that Father perceived a strangulation hazard from the lanyard. There is insufficient evidence that Father was reckless as opposed to being merely negligent in failing to remove the lanyard from the laundry basket. Conduct that creates a risk of injury or harm to a child "shall not be considered child abuse if there is no evidence that the person acted intentionally, knowingly or recklessly" when creating the risk of injury or harm to the child. 23 Pa. C.S. §6303(c).

Likewise, there was no evidence that the choking, electrocution, and crush risks in the bedroom recited by the ALJ represented a substantial risk to Child. Detective testified that he "saw the possibility of [Child] getting behind [the gate] barrier" to access the computer and the television. N.T. 80. To meet the "substantial risk" requirement in Section 302(b)(3) of the Crimes Code, the possibility had to be "real." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 1170; 18 Pa. C.S. §302(b)(3). Father testified that he believed Child was unable to get past the child gate, and the ALJ credited Father's testimony in this regard.

The record shows that Father returned home from work in the early morning of March 11, 2018, and fell back to sleep at 10:00 a.m., while Child "remained loose" in the bedroom. ALJ Decision at 9. The ALJ opined that this demonstrated "extremely and remarkably poor judgment." *Id*. However, CYS did not present evidence that this "poor judgment" constituted a "gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." 18 Pa. C.S. §302(b)(3).

An appellate court may not find facts or reweigh evidence. However, whether the evidence presented by CYS satisfied the standard set forth in the statute is a question of law. *In re S.H.*, 96 A.3d at 455. Here, the record is devoid of

11

evidence that Father made a conscious decision to sleep with the knowledge that, by doing so, he exposed Child to a real possibility of bodily injury from the hazards existing in the bedroom. Nor is there any evidence that Father grossly deviated from what a reasonable person would have found acceptable under the same circumstances. Accordingly, the Department erred by concluding that Father acted recklessly and, thus, committed child abuse.

For these reasons, we reverse the Department's adjudication and direct the expunction of Father's indicated report from ChildLine.


_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

S.H.,                                          :
                    Petitioner                 :
                                               :   **CASE SEALED**
            v.                                 :   No. 535 C.D. 2019
                                               :
Department of Human Services,                  :
                    Respondent                 :

# **O R D E R**

AND NOW, this 18th day of February, 2020, the order of the Pennsylvania Department of Human Services, Bureau of Hearings and Appeals, dated March 7, 2019, in the above-captioned matter is hereby REVERSED, and S.H.'s indicated report is ORDERED to be removed from the ChildLine and Abuse Registry.

_____
MARY HANNAH LEAVITT, President Judge