S.K.,                                   :    **SEALED CASE**
           Petitioner            :
                                    :
                v.                     :
                                    :
Department of Human Services,      :    No. 685 C.D. 2018
           Respondent        :    Argued: February 11, 2019


BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
                  HONORABLE ANNE E. COVEY, Judge (P.)
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION BY
JUDGE COVEY                            FILED: March 27, 2019


        S.K. petitions this Court for review of the Department of Human Services (DHS) Bureau of Hearings and Appeals' (BHA) April 20, 2018 order denying S.K.'s request to expunge his indicated report[1] of child abuse from the ChildLine & Abuse Registry (ChildLine Registry).[2] Essentially, S.K. presents two issues for this Court's review: (1) whether the BHA erred by concluding that S.K.'s actions were reckless and, thus, constituted child abuse; and (2) whether the BHA

---

[1] Section 6303(a) of the Child Protective Services Law (Law) defines an "indicated report" as a report issued by DHS if it "determines that substantial evidence of the alleged abuse by a perpetrator exists based on any of the following: (i) [a]vailable medical evidence[;] (ii) [t]he child protective service investigation[; or] (iii) [a]n admission of the acts of abuse by the perpetrator." 23 Pa.C.S. § 6303(a); *see also* Section 3490.4 of DHS' Regulations, 55 Pa. Code § 3490.4.

[2] Section 3490.4 of the DHS Regulations defines "ChildLine" as

> [a]n organizational unit of [DHS] which operates a Statewide toll-free system for receiving reports of suspected child abuse established under [S]ection 6332 of the [Law] (relating to establishment of Statewide toll-free telephone number), refers the reports for investigation and maintains the reports in the appropriate file. . . .

55 Pa. Code § 3490.4. "The ChildLine Registry is maintained in accordance with the [Law.]" *In re: S.H.*, 96 A.3d 448, 450 n.2 (Pa. Cmwlth. 2014).

erred by concluding that S.K. did not use reasonable force.[3]  Upon review, we reverse.

S.K. was a staff member at a Pennsylvania residential facility (Facility) for children who have been adjudicated dependent or delinquent, or have mental health issues.  On September 16, 2017, DHS' Office of Children, Youth and Families (OCYF) received a report that, on September 15, 2017, S.K. caused bodily injury to a minor (Minor) who resided at the Facility.  *See* Reproduced Record Volume I (R.R. I) at 1-2.  OCYF conducted an investigation, whereby it determined, in pertinent part:

> [S.K.] is [] residential staff who had duties meeting the definition of a child care worker.  [Minor] and [S.K.] were interviewed.  Medical records and video were reviewed.  The video shows that [Minor] was grabbed around [his] waist, lifted off of the floor, rotated in the air, and put on ground with force causing [Minor] to land on [his] shoulders, neck and back.  The force was enough to cause [Minor's] legs/feet to approach [his] head when [Minor] landed on [his] shoulders/head.  [Minor] has a diagnosed concussion as a result of [] being thrown on the ground by [S.K.].  [Minor's] and [S.K.'s] statements are consistent with the video and support the evidence of [S.K.] causing bodily harm to [Minor] through a recent act.

R.R. I at 2 (OCYF Investigation Report at 2).  On October 10, 2017, OCYF filed an indicated report against S.K. as a perpetrator of abuse against Minor.  *See* R.R. I at 4.

---

[3]  S.K. presents six issues in his Statement of Questions Involved: Whether the Administrative Law Judge (ALJ) erred and abused her discretion by denying S.K.'s expunction request where evidence demonstrates that (1) S.K. accidentally inflicted injury on Minor and no mens rea was established; (2) S.K.'s contact with Minor is excluded from the definition of child abuse in Section 6304(c)(1) of the Law, 23 Pa.C.S. § 6304(c)(1); (3) S.K.'s contact with Minor is excluded from the definition of child abuse in Section 6304(c)(2)(i) of the Law, 23 Pa.C.S. § 6304(c)(2)(i); (4) S.K.'s contact with Minor is excluded from the definition of child abuse in Section 6304(c)(2)(ii) of the Law, 23 Pa.C.S. § 6304(c)(2)(ii); (5) S.K.'s contact with Minor is excluded from the definition of child abuse in Section 6304(c)(2)(iii) of the Law, 23 Pa.C.S. § 6304(c)(2)(iii); and (6) the ALJ applied a standard of care less than criminal negligence.  *See* S.K. Br. at iii-iv, 18-24.  Because these issues are subsumed in this Court's analysis of whether the BHA properly applied a recklessness standard in concluding that S.K.'s actions constituted child abuse and whether S.K. used reasonable force, they have been combined herein.

On November 21, 2017, S.K. requested review of OCYF's report by DHS' Secretary. *See* R.R. I at 5-9. By December 7, 2017 letter, the Secretary's designee stated: "We believe the report is accurate and being maintained in a manner consistent with the Child Protective Services Law [(Law)[4]]. Thus[,] the report will remain on file as originally reported." R.R. I at 10. S.K. appealed to the BHA. A hearing was held on March 14, 2018, before an Administrative Law Judge (ALJ). *See* Reproduced Record Volume II (R.R. II) at 1-241. On April 2, 2018, the ALJ issued an adjudication and recommendation denying S.K.'s appeal and declaring that OCYF proved that S.K.'s actions were reckless and, thus, constituted child abuse. *See* R.R. II at 243-267. On April 20, 2018, the BHA adopted the ALJ's recommendation in its entirety. *See* R.R. II at 242. S.K. appealed to this Court.[5]

Initially, Section 6341(a)(2) of the Law authorizes "the [S]ecretary to . . . expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with [the Law]." 23 Pa.C.S. § 6341(a)(2). "[T]he proper inquiry into whether an indicated report of child abuse should be expunged is whether the report is accurate." *B.K. v. Dep't of Pub. Welfare*, 36 A.3d 649, 653 (Pa. Cmwlth. 2012). Moreover, "[OCYF] has the burden of establishing by substantial evidence that an indicated report of child abuse is accurate." *Bucks Cty. Children & Youth Soc. Servs. Agency v. Dep't of Pub. Welfare*, 808 A.2d 990, 993 (Pa. Cmwlth. 2002).

The facts of this case are not in dispute. The parties agree that S.K. was responsible for Minor's welfare and he was trained in and authorized to use Safe

---

[4] 23 Pa.C.S. §§ 6301-6386.

[5] "Our review [of BHA's order] determines whether constitutional rights were violated, whether errors of law were committed or whether necessary findings of fact are supported by substantial evidence." *S.H.*, 96 A.3d at 453 n.4. Section 6303(a) of the Law defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa.C.S. § 6303(a); *see also G.V. v. Dep't of Pub. Welfare*, 91 A.3d 667 (Pa. 2014); *S.H.*

3

Crisis Management (SCM) restraint techniques when a child presents a danger to himself or to others.[6]  *See* R.R. II at 11-12, 111-113, 137, 175, 187.  On September 15, 2017, Minor did not want to attend school.  *See* R.R. II at 26, 45.  At breakfast, Minor notified staff that he intended to get kicked out of school, turn the building upside down and be restrained.  *See* R.R. II at 166.  S.K. attempted choice theory techniques with Minor, asking him how such behavior would assist him in the program.  *See* R.R. II at 167-168.  Minor went to school but, rather than participate, he wrote "I don't care" on his paper and put his head down, prompting his teacher to direct him to leave.  R.R. II at 27, 46-47.  After S.K. witnessed Minor storm out of school, S.K. and staff member D.F. followed Minor to his room to insure Minor's safety and that he did not damage the room.  *See* R.R. II at 49, 172-173.  Due to Minor's behavior in his room, S.K. and D.F. took Minor to a time-out room.[7]  *See* R.R. II at 27, 173-175.  Minor struggled against S.K. on the way to the time-out room.  *See* R.R. II at 174-175.

For approximately the first 10 minutes in the time-out room, Minor paced the floor and hit the walls as S.K. stood in the doorway speaking to him.  *See* R.R. II at 28, 54-55, 100, 177-179.  Eventually, Minor asked S.K. to turn the lights off at the hallway switch so Minor could sleep, but S.K. explained that the lights had to remain on for the video recording that was in place for both their safety.  *See* R.R.

---

[6] For 2½ years, S.K. had been a clinical manager in the Facility's Special Needs 7 unit.  *See* R.R. II at 164.  S.K. held a bachelor's degree with a psychology minor and, at the time of this incident, he was pursuing a graduate degree in clinical mental health counseling.  *See* R.R. II at 164-166.

[7] The time-out room was approximately 5 feet wide and 6 or 7 feet long, with padding on the walls and the floor.  *See* R.R. II at 53, 103.  The hallway immediately outside the time-out room was constructed of concrete, with carpet over the concrete floor.  *See* R.R. II at 53, 59, 103.

D.F. testified that he assisted S.K. in escorting Minor to the time-out room, but was called away to help staff member A.W. with another child and did not witness anything that occurred while Minor and S.K. were in the time-out room.  *See* R.R. II at 160-161.

II at 55-58. Minor nevertheless made two additional attempts to push past S.K. to the hallway to turn the time-out room lights off, and each time made contact with S.K. *See* R.R. II at 28-29, 56, 58-62, 96-97, 104. On Minor's third attempt to reach out of the room, S.K. attempted to use an SCM-approved method to restrain Minor, but ended up restraining Minor in a manner that deviated from his Facility training.[8] *See* R.R. II at 89-92, 112-113, 131, 187-190. Specifically, S.K. lifted up Minor and delivered him to the floor in such a manner that Minor's head and neck struck the floor first. *See* R.R. II at 29-32, 181-182, 186; *see also* S.K. Br. at viii. S.K. held Minor on the floor in a kneeling torso hold until S.K. thought Minor was calm.[9] *See* R.R. II at 31, 64, 181-182, 184.

Immediately after the incident, S.K. escorted Minor back to his room and contacted the infirmary to check Minor. *See* R.R. II at 184. Thereafter, Minor's head and back hurt, and he vomited several times. *See* R.R. II at 30-31. Minor received medical treatment first at the Facility, then at Grove City Medical Center emergency room, and finally at UPMC Children's Hospital of Pittsburgh. *See* R.R. II at 32-36, 38-41, 124-125. Minor was diagnosed with a concussion. *See* R.R. II at 40, 138, 191, 193. The Facility discharged S.K. for his use of improper technique on September 15, 2017. *See* R.R. II at 95, 100.

Section 6303(b.1) of the Law provides, in pertinent part: "The term 'child abuse' shall mean intentionally, knowingly or recklessly . . . [c]ausing bodily

---

[8] S.K. reported that he called out for help twice before the incident occurred, and once after he had Minor on the ground, but D.F. and A.W. were occupied with the other incident. *See* R.R. II at 179-180.

[9] Although it was standard practice for Facility staff to carry panic alarms with them to summon assistance when necessary, when this incident occurred, S.K. did not have a panic alarm available to him. *See* R.R. II at 101, 176-177. There were three Facility staff (S.K., D.F. and A.W.) on duty on September 15, 2017, and A.W. had the only panic alarm, since the night staff either took one home or misplaced it. *See* R.R. II at 160.

injury to a child through any recent act or failure to act."[10]  23 Pa.C.S. § 6303(b.1).

Section 6303(c) of the Law specifies:

> Conduct that causes injury or harm to a child or creates a risk of injury or harm to a child shall not be considered child abuse if there is no evidence that the person acted intentionally, knowingly or recklessly when causing the injury or harm to the child or creating a risk of injury or harm to the child.

23 Pa.C.S. § 6303(c).  The BHA in this case adopted the ALJ's conclusion that S.K. did not intentionally or knowingly harm Minor, but that his actions were reckless and, thus, constituted child abuse under the Law.  *See* R.R. II at 242, 264-265.

S.K. argues that the BHA erred by applying a recklessness standard and concluding that he committed child abuse.  He claims that since he accidentally injured Minor on September 15, 2017, pursuant to the Supreme Court's decision in *P.R. v. Department of Public Welfare*, 801 A.2d 478 (Pa. 2002), the BHA should have applied a criminal negligence standard.

Preliminarily, in *P.R.*, an indicated report of child abuse was filed naming the mother as the perpetrator after she inflicted a serious eye injury on the child while attempting to strike the child with a belt as punishment for writing on the walls.  DHS applied a foreseeability standard, concluded that the child's injury resulted from abuse, and denied the mother's request to expunge the indicated report. This Court reversed DHS' order, "finding that foreseeability alone was an insufficient basis to sustain a conclusion that the injury resulted from abuse rather than an accident."  *Id.* at 479.

---

[10] "Bodily injury" is defined in Section 6303(a) of the Law as "[i]mpairment of physical condition or substantial pain."  23 Pa.C.S. § 6303(a).

6

On appeal, the Pennsylvania Supreme Court affirmed this Court's conclusion that the mother's indicated report should be expunged, but did not endorse this Court's foreseeability standard. Rather, our Supreme Court held:

> To balance the competing objectives of protecting children from abuse while maintaining the parental right to use corporal punishment, the legal standard for differentiating abuse from accident must acknowledge some level of culpability by the perpetrator that his actions could reasonably create a serious injury to the child. The standard that best comports with the problem of defining abuse in terms of nonaccidental injury is criminal negligence.
>
> Criminal negligence intertwines the concepts of foreseeability and intent to a degree that this [Supreme C]ourt finds appropriate for differentiating cases of accidental and nonaccidental injury in keeping with the legislative directive contained within the [Law]. The legislature has defined criminal negligence as follows:
>
>> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.
>
> 18 Pa.C.S.[] § 302(b)(4). This definition satisfies the parameters of defining an injury caused by abuse as something that occurs in contrast to an injury caused by accident.
>
> Accordingly, . . . **in cases where a child suffers a serious injury arising from the administration of corporal punishment, a finding that the injury resulted from abuse versus accident will depend upon a showing, by the agency, through substantial evidence, that the injury resulted from criminal negligence**.

*Id.* at 486-87 (emphasis added).

7

Although the Law has been amended since *P.R.* was decided, this Court has held that "the criminal negligence standard proffered by our Supreme Court in *P.R.* is now codified in the [Law] under the auspices of the definition of 'nonaccidental.' The result is that *P.R.* remains controlling precedent, and **criminal negligence is still the proper standard <u>in corporal punishment cases</u>**." *F.R. v. Dep't of Pub. Welfare*, 4 A.3d 779, 787 (Pa. Cmwlth. 2010) (bold and underline emphasis added). However, because the instant matter does not involve corporal punishment, *P.R.* is inapposite.[11] Accordingly, the BHA properly declined to apply a criminal negligence standard, and applied a recklessness standard when reviewing S.K.'s appeal.

Section 6303(a) of the Law states that the term "recklessly" as used in the Law "shall have the same meaning as provided in [Section 302 of the Crimes Code,] 18 Pa.C.S. § 302 (relating to general requirements of culpability)." 23 Pa.C.S. § 6303(a). Section 302(b)(3) of the Crimes Code establishes:

> **A person acts recklessly** with respect to a material element of an offense **when he consciously disregards a substantial and unjustifiable risk** that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, **its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation**.

18 Pa.C.S. § 302(b)(3) (emphasis added).

At the hearing, OCYF presented the September 15, 2017 video recording, the Facility's Emergency Safety Physical Intervention (ESPI) Report, OCYF's Investigation Report, Minor's medical records, and testimony from Minor,

_____

[11] Notably, Section 3800.32(b) of DHS' Regulations applicable to child residential facilities specifies that "[a] child may not be . . . subject to corporal punishment." 55 Pa. Code § 3800.32(b). Therefore, S.K. was prohibited from inflicting corporal punishment on Minor.

the Facility's Vice President of Treatment Services S.D. (S.D.), and OCYF Human Services Program representative Wilson Smith (Smith). S.K. testified and presented D.F.'s testimony.

Minor testified that he could not recall specifically how S.K. restrained him in the time-out room, only that he was lifted off the ground and then was on the ground. *See* R.R. II at 29-30, 52-53. He claimed that he was tired, not angry, acting out or clenching his fists, and stated he was touching or tapping the time-out room walls rather than hitting them. *See* R.R. II at 31, 47, 49, 54-55, 63. Minor admitted making contact with S.K. every time he attempted to reach the light switch, but maintained that it was "not forcefully." R.R. II at 60.

S.D. testified that after she learned of S.K.'s restraint of Minor, she reviewed the ESPI Report, the video recording and Minor's medical records. *See* R.R. II at 85-89. She acknowledged that S.K. clearly attempted to talk to Minor for approximately 10 minutes, yet Minor appeared to be agitated and was punching the walls, and tried to push past S.K. more than once. *See* R.R. II at 96-97. S.D. further opined that "[v]erbal behavior is not a danger," and that no approved restraint method authorized S.K. to subdue Minor to the floor. R.R. II at 113; *see also* R.R. II at 111-112. She expressed that take-downs would only be appropriate in the most extreme cases and this was not one of them. *See* R.R. II at 115-116. However, based upon Minor's position in the time-out room, S.D. acknowledged the possibility that if S.K. had effectuated a proper upper torso restraint, Minor would have had access to the doorway and the hall. *See* R.R. II at 104.

Smith, the OCYF employee assigned to investigate the incident, testified that he reviewed the video footage and Minor's medical records, and interviewed Minor, whose recollection of the incident was the same as his testimony, in that he could not recall details of the restraint itself. *See* R.R. II at 130, 132. Smith agreed that Minor needed to be in the time-out room and, although Minor's reaching outside

9

the room was sufficient justification for S.K. to restrain Minor, the take-down was not necessary since it was evident that S.K. was in complete control of Minor at that point. *See* R.R. II at 137, 146-148.

S.K. testified that, although he was not aware of Minor's specific diagnosis, the youth in the Facility unit he supervised on September 15, 2017, had been adjudicated delinquent, had behavioral health issues, or both. *See* R.R. II at 169-171. He acknowledged that he was taught that any time a restraint is used, there is potential for injury, and that there was an increased injury risk if an unapproved restraint is used. *See* R.R. II at 186-187, 189-190. S.K. explained that he had a good relationship with Minor, he cared about him and wanted him to do well. *See* R.R. II at 171.

S.K. stated that Minor's demeanor when he left the classroom that morning was "like a combination of sarcastic and angry[; he] wanted to show that he got kicked out of school and he's in charge." R.R. II at 173. S.K. recalled that because Minor took a fighting stance with clenched fists in his room, S.K. used an SCM-approved extended arm escort technique when he and D.F. took Minor to the time-out room. *See* R.R. II at 174-175. S.K. reported that, in the time-out room, Minor was walking in circles with clenched fists and threatening to assault S.K., his peers and staff members, and to get out of the Facility "his way." R.R. II at 177. He described that, during this time, he was talking to Minor (using choice techniques) and asking how he could help Minor. *See* R.R. II at 177-178.

S.K. stated that, after Minor contacted him to get past him the second time, S.K. warned Minor that if he tried it again, S.K. would have to restrain him. *See* R.R. II at 180. S.K. recounted that the other staff members did not respond to his two calls for help[12] and Minor's behavior in the time-out room was escalating, so

---

[12] At the time, D.F. and A.W. were dealing with an incident involving another child. *See* R.R. II at 160-161.

when Minor approached him the third time, he intended to place Minor in an upper torso restraint[13] to keep him from leaving the room and either fulfilling his threats or getting hurt in the concrete hallway. *See* R.R. II at 179-182. S.K. testified:

> In a split second, I had to think -- I had to think outside of this time-out room, it is concrete floors, concrete walls, there are other youth out there who he may or may not try to harm, other staff members that [Minor] may or may not try to harm, and that I have to keep him in the time-out room for everybody's safety.
>
> It's a small room. I was initially in a doorway, which makes it difficult to get around. And I got him by the waist. I intended for an upper torso. It did not happen. I made a mistake. But I had to commit, or a more serious injury could have happened.

R.R. II at 181. He reported that he tried to pull Minor back in the room, but ended up lifting him. *See* R.R. II at 182. S.K. testified that he was not angry and he did not intend to lift Minor or for Minor to hit his head or otherwise get hurt in any way. *See* R.R. II at 182-183. S.K. acknowledged his mistake and admitted that his take-down was improper. *See* R.R. II at 131, 183, 185.

"In child abuse expunction proceedings, the [BHA], as the [DHS] Secretary's designee, is the ultimate finder of fact, and the ultimate arbiter of the weight to be assigned to the evidence presented." *Beaver Cty. Children & Youth Servs. v. Dep't of Pub. Welfare*, 68 A.3d 44, 47 n.4 (Pa. Cmwlth. 2013); *see also D.T. v. Dep't of Pub. Welfare*, 873 A.2d 850 (Pa. Cmwlth. 2005). Here, the BHA adopted the ALJ's finding that all of the witnesses testified credibly, and the ALJ's conclusion that S.K.'s actions were reckless and, therefore, constituted child abuse under the Law. *See* ALJ Dec. at 11, 21-23. The BHA also relied upon the ALJ's reasoning:

---

[13] S.K. described the SCM upper torso restraint: "You're standing up, and you swoop your arms over the shoulders (indicating), and you hold your arms together . . . [with the child] facing away." R.R. II at 93-94.

[A]ny reasonable adult knows that picking a child up off the ground and slamming him head first to the ground creates a substantial and unjustifiable risk of serious injury to the child. In this case, although [S.K.] had to act quickly, he nevertheless slammed [Minor] to the ground head first, disregarding a substantial and unjustifiable risk [Minor] would suffer bodily injury as a result.

Not only was [S.K.'s] take-down of [Minor] in violation of his SCM training, it was a gross deviation from the standard of conduct that a reasonable person would observe in his situation. [Minor] was certainly agitated; making inappropriate comments about wanting to get out of the [time-out room], turn off the lights, etc.; and repeatedly moved toward (and made physical contact with) [S.K.] in [an] attempt to turn the lights off. But [Minor's] action's did not warrant the kind of 'take-down' [S.K.] performed.

. . . . This was a situation where a troubled child was frustrated, verbally acting out, and disobeying [S.K.'s] verbal commands not to turn off the time-out room lights. No reasonable person in [S.K.'s] situation, especially a person with [S.K.'s] specialized SCM training, would have picked [Minor] up off the floor and slammed him head first into the ground and with as much force as [S.K.] did. . . .

[S.K.] repeatedly testified he 'made a mistake' and did not mean to take [Minor] to the ground as hard as he did. Regardless, [S.K.] intentionally used a non-SCM technique in violation of his training, knowing it increased the risk of injury to [Minor]; intentionally put [Minor] in a bear-hug; intentionally lifted [Minor] up off the ground; and intentionally and forcefully slammed [Minor] to the ground head first. While [S.K.] may believe, in retrospect, that his actions were a 'mistake,' what matters is that in the moment, [S.K.] acted in disregard of a substantial and unjustifiable risk [Minor] would suffer bodily injury.

ALJ Dec. at 21-22; R.R. II at 264-265. Accordingly, the BHA held that the evidence supporting S.K.'s indicated report of child abuse was accurate and the report is being maintained in accordance with the Law.

"It goes without saying that an appellate court may not find facts or reweigh the evidence. Nevertheless, whether [OCYF's] evidence satisfied the standard set forth in the statute is a question of law." *In re: S.H.*, 96 A.3d 448, 455 (Pa. Cmwlth. 2014) (citations omitted). Under the Law, S.K. acted recklessly if there was a "**substantial and unjustifiable risk**" about which S.K. was aware but "**consciously disregard**[ed]," and his disregard of that risk "**gross**[ly] **deviat**[ed]" from what another reasonable person in his situation would have done. 18 Pa.C.S. § 302(b)(3). Because those key terms are not defined in either the Crimes Code or the Law, they "must be construed in accordance with [their] common and ordinary meaning[s]. *See* 1 Pa.C.S. § 1903(a). It is well-established that the common and approved meaning of a word may be ascertained from an examination of its dictionary definition." *Chamberlain v. Unemployment Comp. Bd. of Review*, 114 A.3d 385, 394 (Pa. 2015).

Merriam-Webster's Collegiate Dictionary (11th ed. 2004) (Merriam-Webster's) defines "risk" as the "possibility of loss or injury: PERIL[.]" *Id.* at 1076. The risk must be substantial and unjustifiable. Merriam-Webster's defines "substantial" as "not imaginary or illusory: REAL, TRUE[.]" *Id.* at 1245. Although "unjustifiable" is not separately defined, Merriam-Webster's defines "justifiable" as "capable of being justified: EXCUSABLE." *Id.* at 680. By extension, "unjustifiable" means incapable of being justified or inexcusable. Accordingly, here, the substantial and unjustifiable risk would be the real possibility that Minor would sustain a bodily injury for which there is no justification, excuse or defense.

To meet the definition of reckless, S.K. had to have consciously disregarded that risk. Merriam-Webster's defines "conscious" as "perceiving, apprehending, or noticing with a degree of controlled thought or observation[.]" *Id.* at 265. Merriam-Webster's defines "disregard" as "to pay no attention to: treat as

unworthy of regard or notice[.]" *Id.* at 362. Thus, S.K. had to have perceived, but ignored the risk or deemed it unworthy of regard.

Finally, S.K.'s conscious disregard of the risk had to have grossly deviated from what a reasonable person in S.K.'s circumstances would have found acceptable. Merriam-Webster's defines "gross" as "immediately obvious[;] . . . glaringly noticeable usu[ally] because of inexcusable badness or objectionableness[.]" *Id.* at 551. Merriam-Webster's defines "deviation" as a "noticeable or marked departure from accepted norms of behavior." *Id.* at 342. Therefore, S.K. had to have glaringly obviously deviated from conduct a reasonable person would find acceptable in the same circumstances.

> In *Fitsko v. Gaughenbaugh*, . . . 69 A.2d 76 ([Pa.] 1949), [the Pennsylvania Supreme Court] cited with approval the Restatement (Second) of Torts definition of 'reckless disregard' and its explanation of the distinction between ordinary negligence and recklessness. Specifically, the Restatement (Second) of Torts defines 'reckless disregard' as follows:
>
> > The actor's conduct is in reckless disregard of the safety of another if he does an act . . . knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such **risk is substantially greater than that which is necessary to make his conduct negligent**.
>
> Restatement (Second) of Torts § 500 (1965). The Commentary to this Section emphasizes that '[**recklessness**] **must not only be unreasonable**, **but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent**.' *Id.,* cmt. a. Further, as relied on in *Fitsko*, the Commentary contrasts negligence and recklessness:

Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. . . . **The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk**, but this difference of degree is so marked as to amount substantially to **a difference in kind**.

*Id.,* cmt. g; *see also* AMJUR Negligence § 274 ('**Recklessness** is more than ordinary negligence and more than want of ordinary care; it **is an extreme departure from ordinary care, a wanton or heedless indifference to consequences, an indifference whether or not wrong is done, and an indifference to the rights of others**'). Our criminal laws similarly distinguish recklessness and negligence on the basis of the consciousness of the action or inaction. *See* 18 Pa.C.S.[] § 302(b)(3), (4) (providing that a person acts recklessly when he 'consciously disregards a substantial and unjustifiable risk,' while a person acts negligently when he 'should be aware of a substantial and unjustifiable risk').

This conceptualization of recklessness as requiring *conscious* action or inaction not only distinguishes recklessness from ordinary negligence, but **aligns it more closely with intentional conduct**.

*Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1200-01 (Pa. 2012) (emphasis added).

15

Section 302(b)(3) of the Crimes Code, incorporated by Section 6303(a) of the Law, specifies that a determination of whether the risk was of such a nature and degree that its disregard vastly departed from acceptable conduct must be determined "**considering the nature and intent of** [**S.K.'s**] **conduct** and the **circumstances known to** [**S.K.**]" **when the incident occurred.** 18 Pa.C.S. § 302(b)(3) (emphasis added).

Here, the credible testimony does not support the BHA's denial of S.K.'s expungement request. The record evidence demonstrates that S.K. was a concerned staff person who tried everything within his means to de-escalate Minor's behavior. The circumstances known to S.K. were that Minor was agitated and threatening, and he had already carried out one of his threats – to get thrown out of school. S.K. maintained self-control. He talked and acted calmly toward Minor, using SCM-approved choice theory techniques, but Minor's agitation escalated. S.K. did not have a panic button or staff assistance available to him, and he was aware that a camera was recording his actions. Minor twice attempted to reach or get outside the time-out room, each time physically contacting S.K. in the process. S.K. warned Minor that a third try would result in restraint, and S.K.'s requests for assistance were futile. S.K. intended to use an SCM-approved upper torso restraint but, in a split-second decision to protect Minor and other residents, S.K.'s upper torso restraint did not go as planned, S.K. used a modified wrestling move and Minor landed on the floor. S.D. acknowledged the possibility that if S.K. had effectuated a proper upper torso restraint, Minor would have had access to the doorway and the hall.

This Court acknowledges that S.K. was aware that bodily injury could occur when SCM-approved manual restraints are used, and the risk increased if other restraint techniques are used. However, the OCYF failed to establish that, under the circumstances facing S.K. on September 15, 2017, S.K. consciously disregarded or was indifferent to the risk that Minor could be injured when S.K. restrained him. Nor

16

is there any credible record evidence that S.K. grossly deviated from what a reasonable person would have found acceptable under the same circumstances. Accordingly, the BHA erred by concluding that S.K. acted recklessly and, thus, committed child abuse.[14]

Based on the foregoing, the BHA's April 20, 2018 order is reversed.

_____
ANNE E. COVEY, Judge

---

[14] In light of this Court's disposition of the first issue, it need not address the second issue which was S.K.'s defense under Section 6304(c) of the Law.

S.K.,                                   :    **SEALED CASE**
        Petitioner          :
                    :
        v.                 :
                    :
Department of Human Services,           :    No. 685 C.D. 2018
        Respondent         :

# O R D E R

AND NOW, this 27th day of March, 2019, the Department of Human Services Bureau of Hearings and Appeals' April 20, 2018 order is reversed.

_____
ANNE E. COVEY, Judge