IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.M.K.,                                       :
                        Petitioner            :     **CASE SEALED**
                                              :
            v.                                :     No. 1590 C.D. 2019
                                              :     Submitted: May 29, 2020
Department of Human Services,                 :
                        Respondent            :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE ELLEN CEISLER, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY PRESIDENT JUDGE LEAVITT[1]                        FILED: October 23, 2020

      J.M.K. (Stepmother), *pro se*, petitions for review of an adjudication of
the Department of Human Services (Department) that denied her request to expunge
an indicated report from the ChildLine and Abuse Registry (ChildLine) naming her
as a perpetrator of child abuse.[2]  The Department, adopting the recommendation of
the administrative law judge (ALJ), held that Stepmother acted recklessly by not
removing certain antidepressant medications from the house, which her stepson,
C.T. (Child), ingested.  Stepmother did not believe these medications were
dangerous or presented a substantial risk to Child.  Accordingly, Stepmother argues
the Department erred in holding that she committed child abuse within the meaning
of the Child Protective Services Law.[3]  After review, we reverse.

---

[1] This case was reassigned to the author on August 3, 2020.

[2] ChildLine is "[a]n organizational unit of the Department which operates a Statewide toll-free
system for receiving reports of suspected child abuse [and] . . . refers the reports for investigation
and maintains the reports in the appropriate file."  55 Pa. Code §3490.4.

[3] 23 Pa. C.S. §§6301-6387.

The facts are undisputed. Child was 12 years old at the time he ingested the antidepressants. Child lives with Stepmother and his biological father, J.K. (Father). Stepmother has been involved in Child's life since he was two years old, and Child's biological mother is "not in the picture." Certified Record (C.R.) at 12. Child suffers from depression, post-traumatic stress disorder, and attention-deficit/hyperactivity disorder. Prior to the incident, Child had been receiving outpatient psychiatric therapy and attending a therapy session every Wednesday.

On December 19, 2018, Stepmother noticed that Child appeared unusually tired after an appointment with his therapist and afterwards "passed out" asleep on the couch at home. ALJ Decision at 3, Findings of Fact, ¶8. She called Father who returned home and woke Child. Father found Klonopin in Child's pockets, an anti-anxiety medication prescribed to Father. Stepmother went to Child's bedroom where she found more Klonopin pills, which she gathered and put in her bedroom closet for later disposal. Stepmother and Father did not seek medical treatment for Child that evening, but Father slept with Child on the couch.

The next morning, Child was groggy, and Father allowed him to stay home from school. Father took the Klonopin pills and discarded them. Father checked on Child at lunchtime, and he was eating lunch and watching television. When Stepmother returned home from work in the evening, she found Child unresponsive on the couch surrounded by pill bottles containing Seroquel, Wellbutrin, Flexeril, and Cetirina, a form of Benadryl. The Seroquel, Wellbutrin and Flexeril medications were prescribed to Stepmother and Father.

Stepmother called 911. At the hospital, Child presented with acute hypoxia, respiratory failure, and altered mental status. Child was admitted to the pediatric intensive care unit (ICU) as a result of his polysubstance ingestion.

2

During Child's hospitalization, Stepmother met with a hospital social worker (Social Worker) and expressed surprise that Child had ingested the medications. She did not believe that Child's depression was significant or that he would attempt suicide by taking pills. ALJ Decision at 4, Findings of Fact, ¶18. She suspected that Child had ingested Klonopin when he appeared to pass out on the couch; Child had researched the effects of Klonopin on an "electronic tablet." *Id.*

On December 21, 2018, Children and Youth Services (CYS) received a report from the hospital of Child's drug overdose and began an investigation. A caseworker interviewed Stepmother, who again expressed her suspicion that Child had ingested Klonopin because Father had found the pills in Child's pockets after Child fell asleep on the couch. Stepmother advised Caseworker that she and Father did not call the police because Father, who had a prior drug history, thought Child would "sleep [it] off." ALJ Decision at 5, Findings of Fact, ¶23. Stepmother believed that Child's therapist would have noticed during the December 19, 2018, appointment if anything was "off" with Child. *Id*. at 5, Findings of Fact, ¶25. Caseworker did not speak with Child because he was intubated and medically sedated.

CYS filed an indicated report of child abuse against Stepmother on the basis that she had failed to secure all prescription medications in the home after Child had ingested Father's Klonopin on December 19, 2018.[4] Stepmother filed an appeal, and a hearing was conducted by an ALJ appointed by the Department's Bureau of Hearings and Appeals.

---

[4] CYS filed an indicated report against Father as well. C.R. 12.

At the hearing, CYS presented testimony from Social Worker, Caseworker, and an attending physician of Child at the ICU (Attending Physician). CYS also entered as evidence its investigation records and Child's medical records.

Stepmother testified that she knew Child would be alone the morning after he had ingested Klonopin, but she was not concerned that he would take any other medication. Notes of Testimony (N.T.), 8/5/2019, at 155. She asked Father to "check in on [Child] at lunch" because Father was working "in the [] area." N.T. 136. She intended to call Child's therapist, who had seen Child "the day before" but did not raise "[a]ny red flags" as a result of the visit. N.T. 136, 159. Stepmother asked Child about the Klonopin, and Child responded that he "had no idea what [she] was talking about." N.T. 155.

Stepmother testified that Father's Klonopin was kept inside in a closet that she and Father "forgot about"; Child would have had to search the house to find it. N.T. 162-63. After Child ingested Klonopin, she and Father secured the remaining Klonopin pills, and Father removed them from the house the next day. Stepmother testified that the Seroquel, Flexeril, and Wellbutrin were kept inside a kitchen cabinet. She took no steps to secure them after Child's ingestion of Klonopin because they were "just antidepressants" and not something one "takes to overdose on." N.T. 151.

On cross-examination, Stepmother maintained that she did not know that Child would take Seroquel, Flexeril, and Wellbutrin:

> [Counsel]: [W]ould you consider the fact that [Child] took Klonopin a red flag that he might take other medication?
>
> [Stepmother]: Not - no.
>
> [Counsel]: That's not a red flag in your mind?

4

[Stepmother]: No.

[Counsel]: A child that's taking medication that's not prescribed to them, doesn't signal to you that they may be getting into things that they shouldn't be and that there may be a risk that they might do so in the future?

[Stepmother]: Yes. So that's why we have therapy.

[Counsel]: It does signal to you that there's a risk that they might do it in the future?

[Stepmother]: It's possible that anybody could.

N.T. 160-61.

Stepmother denied telling Social Worker and Caseworker that Child had researched the effects of Klonopin. Rather, she testified that she told Caseworker that Child was listening to a rap song called "Klonopin" on an electronic tablet. N.T. 146.

CYS acknowledged that it was required to establish "gross negligence" by Stepmother. N.T. 172. It argued that Stepmother exercised "poor judgment" in not removing the Seroquel, Flexeril, and Wellbutrin from the kitchen cabinet. N.T. 174. CYS asserted that, "at a bare minimum, a reasonable standard would have been to remove any medication that [C]hild could get into if you were going to leave him alone to sleep it off." N.T. 173-74.

The ALJ denied Stepmother's appeal. In doing so, the ALJ stated that the standard for child abuse by omission is "whether a reasonable person in the position of the parent knew or should have known that acts of abuse were occurring and whether the parent failed to take steps to remove child from harm's way." ALJ Decision at 10 (citing *Bucks County Children & Youth Social Services Agency v. Department of Public Welfare*, 616 A.2d 170 (Pa. Cmwlth. 1992)). The ALJ further

5

explained that CYS had "to present substantial evidence that [Stepmother] knew or should have known of the significant risk to [Child] and failed to take protective measures." ALJ Decision at 10 (citing *L.S. v. Department of Public Welfare*, 828 A.2d 480 (Pa. Cmwlth. 2003)). The ALJ concluded that CYS's evidence demonstrated that Stepmother "consciously disregarded a substantial risk by failing to remove or secure the [Seroquel, Wellbutrin, and Flexeril] and [her] failure to protect [Child] ultimately caused bodily injury to him." ALJ Decision at 15.

In reaching this conclusion, the ALJ credited the testimony of Social Worker, Caseworker, and Attending Physician. The ALJ also credited Stepmother's testimony, except to the extent she told Caseworker that Child was listening to a rap song called "Klonopin," as opposed to doing his own research on the drug's effects on an electronic tablet. ALJ Decision at 14. The ALJ found, based upon a review of "the totality of the evidence presented," that

> [Stepmother] knew that the pills were in the residence and that [Child] would be home alone on the day of the alleged incident of physical abuse. In addition, [Stepmother] knew that [Child] had ingested Klonopin the day before and although the Klonopin was removed, [Stepmother] failed to remove Seroquel, Wellbutrin and Flexeril that were in the kitchen. [Stepmother] was completely aware of the prior circumstances regarding [Child]'s ingestion. Therefore, since [Stepmother] was aware that [Child] ingested pills, in failing to remove the Seroquel, Wellbutrin and Flexeril, she consciously disregarded a substantial risk…. *[Stepmother's] failure to remove or secure the medications* that were easily accessible to [Child] *was irresponsible and careless and involves a gross deviation from the standard of conduct that a reasonable person would observe* in the actor's situation.

ALJ Decision at 14-15 (emphasis added).

6

The ALJ recommended that Stepmother's expungement request be denied. On October 1, 2019, the Department adopted the ALJ's recommendation in its entirety. Stepmother now petitions this Court for review.[5]

On appeal, Stepmother argues that the Department erred in holding that she was a perpetrator of child abuse because the evidence did not establish that her actions were reckless. The ALJ erred in his application of the "gross negligence" standard by "simply call[ing] it [] recklessness." Stepmother Brief at 19. Stepmother argues that she did not consciously disregard a substantial risk by not removing the Seroquel, Wellbutrin, and Flexeril. She did not anticipate Child would take these medications, and the ALJ credited her testimony in that regard. Stepmother was not aware that Child was at risk of polysubstance ingestion, and she believed that Seroquel, Wellbutrin, and Flexeril were "just antidepressants" and not something that "someone takes to overdose on." Stepmother Brief at 17. By contrast, Klonopin is classified by the federal government as a scheduled controlled substance and is generally known to the public as dangerous and carries the potential for abuse. Stepmother argues that because she did not "perceive the risk," she could not "disregard [the risk] or treat it [as] unworthy of regard or notice." Stepmother Brief at 16.

---

[5] This Court's review determines whether legal error has been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence. *T.H. v. Department of Human Services*, 145 A.3d 1191, 1196 n.6 (Pa. Cmwlth. 2016) (quoting *F.R. v. Department of Public Welfare*, 4 A.3d 779, 782 n.7 (Pa. Cmwlth. 2010)). "In child abuse expunction proceedings, the [Bureau of Hearings and Appeals], as the [Department] Secretary's designee, is the ultimate finder of fact, and the ultimate arbiter of the weight to be assigned to the evidence presented." *Beaver County Children & Youth Services v. Department of Public Welfare*, 68 A.3d 44, 47 n.4 (Pa. Cmwlth. 2013). Nevertheless, whether a county agency's evidence satisfied the evidentiary standard set forth in the statute is a question of law. *In re S.H.*, 96 A.3d 448, 455 (Pa. Cmwlth. 2014).

We begin with a review of the Child Protective Services Law. "The proper inquiry into whether an indicated report of child abuse should be expunged or maintained is whether the report is accurate." *L.S.*, 828 A.2d at 483. "[CYS] has the burden of establishing by substantial evidence that an indicated report of child abuse is accurate. If CYS fails to sustain that burden, a request for expungement will be granted." *Bucks County Children & Youth Social Services Agency v. Department of Public Welfare*, 808 A.2d 990, 993 (Pa. Cmwlth. 2002). Section 6303(a) of the Child Protective Services Law defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). The "substantial evidence" standard set forth in Section 6303(a) is "the equivalent of the preponderance of the evidence standard." *T.H.*, 145 A.3d at 1198.

Under the Child Protective Services Law, child abuse requires intentional conduct by the perpetrator. Section 6303(b.1) defines "child abuse" as follows:

> The term "child abuse" shall mean *intentionally, knowingly or recklessly* doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> &ast;&ast;&ast;
>
> (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

23 Pa. C.S. §6303(b.1) (emphasis added). Section 6303(c) further explains as follows:

> Conduct that causes injury or harm to a child or creates a risk of injury or harm to a child shall not be considered child abuse if

8

there is no evidence that the *person acted intentionally, knowingly or recklessly when causing the injury or harm to the child* or creating a risk of injury or harm to the child.

23 Pa. C.S. §6303(c) (emphasis added).

In the case *sub judice*, Child suffered bodily injury when he overdosed on Seroquel, Wellbutrin, and Flexeril. The Department concluded that Stepmother acted recklessly because she did not remove those medications from the house after Child ingested Klonopin. The question is whether the Department correctly applied the law to the facts, which are not disputed in any material way.

Section 6303(a) states that the term "recklessly" "shall have the same meaning as provided in 18 Pa. C.S. §302 (relating to general requirements of culpability)." 23 Pa. C.S. §6303(a). In turn, Section 302(b)(3) of the Crimes Code defines the term as follows:

> A person acts recklessly ... when he *consciously disregards* a *substantial and unjustifiable risk* that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation*.

18 Pa. C.S. §302(b)(3) (emphasis added).

The key terms, "consciously disregard," "substantial and unjustifiable risk," and "gross deviation" are not defined in either the Crimes Code or the Child Protective Services Law. Accordingly, they must be construed in accordance with "their common and approved usage." 1 Pa. C.S. §1903(a). This Court has interpreted those terms as follows:

> Merriam-Webster's Collegiate Dictionary (11th ed. 2004) (Merriam-Webster's) defines "risk" as the "possibility of loss or

9

injury: PERIL[.]" *Id.* at 1076. The risk must be substantial and unjustifiable. Merriam-Webster's defines "substantial" as "not imaginary or illusory: REAL, TRUE[.]" *Id.* at 1245. Although "unjustifiable" is not separately defined, Merriam-Webster's defines "justifiable" as "capable of being justified: EXCUSABLE." *Id.* at 680. By extension, "unjustifiable" means incapable of being justified or inexcusable. *Accordingly, here, the substantial and unjustifiable risk would be the real possibility that [the child] would sustain a bodily injury for which there is no justification, excuse or defense….*

Merriam-Webster's defines "conscious" as "perceiving, apprehending, or noticing with a degree of controlled thought or observation[.]" *Id.* at 265. Merriam-Webster's defines "disregard" as "to pay no attention to: treat as unworthy of regard or notice[.]" *Id.* at 362. *Thus, [the accused perpetrator] had to have perceived, but ignored the risk or deemed it unworthy of regard.*

Finally … Merriam-Webster's defines "gross" as "immediately obvious[;] ... glaringly noticeable usu[ally] because of inexcusable badness or objectionableness[.]" *Id.* at 551. Merriam-Webster's defines "deviation" as a "noticeable or marked departure from accepted norms of behavior." *Id.* at 342. *Therefore, [the accused perpetrator] had to have glaringly obviously deviated from conduct a reasonable person would find acceptable in the same circumstances.*

*S.K. v. Department of Human Services*, 206 A.3d 644, 653-54 (Pa. Cmwlth. 2019) (emphasis added).

In *S.H. v. Department of Human Services*, 228 A.3d 22, 28 (Pa. Cmwlth. 2020), this Court held that a father did not act recklessly after his infant daughter strangled herself with a lanyard located in a laundry basket in the bedroom. The ALJ found that the father had tucked the lanyard back into the basket on the previous occasions that his daughter had pulled it out. This finding alone, however, did not demonstrate that the father "perceived" a "real possibility" of strangulation

10

and "purposely ignored" that hazard. *Id.* Notably, the father had taken precautions to address a risk he did perceive in the bedroom by installing a gate to prevent the child's access to electrical wires. Simply, there was insufficient evidence that the father was reckless, as opposed to being merely negligent, in failing to remove the lanyard from the laundry basket.

Likewise, in *R.W. v. Department of Human Services*, 128 A.3d 839 (Pa. Cmwlth. 2015), this Court held that a mother did not act with criminal negligence[6] when her child died in a bathtub after being left unattended by the father. The mother entrusted the child's care to the father even though he had a history of mental health issues. However, he had never abused the child or physically harmed any person. The father and the child had just returned from a two-week vacation during which there were no indications that anything amiss occurred. The child had taken swimming lessons and was familiar with water. This Court concluded that the mother's knowledge that father would sometimes leave the child unattended in the bathtub "did not make [the mother] aware that [the father] posed a significant risk of physically abusing [the child] such that her failure to remove [the child] from [the

---

[6] *R.W.* was decided under the prior definition of "child abuse," which defined the term, in pertinent part, as "[a]ny recent act or failure to act by a perpetrator which causes nonaccidental serious injury to a child under 18 years of age." 23 Pa. C.S. § 6303(b)(1)(i) (repealed by the Act of December 18, 2013, P.L. 1170, effective December 31, 2014). "Nonaccidental" was defined as "[a]n injury that is the result of an intentional act that is committed with disregard of a substantial and unjustifiable risk," 23 Pa. C.S. § 6303(a) (repealed by the Act of December 18, 2013, P.L. 1170, effective December 31, 2014), and was "considered the same standard as criminal negligence." *R.W.*, 128 A.3d at 843.

With the definition of "child abuse" being amended as "*intentionally, knowingly or recklessly* … [c]ausing bodily injury to a child through any recent act or failure to act … [or] [c]reating a reasonable likelihood of bodily injury to a child through any recent act or failure to act," 23 Pa. C.S. § 6303(b.1) (emphasis added), the criminal negligence standard no longer applies except in corporal punishment cases. *S.K.*, 206 A.3d at 650. The instant matter does not involve corporal punishment; as such, to the extent that the ALJ cited to a criminal negligence standard in denying Stepmother's appeal, the ALJ erred.

11

father]'s care made her a perpetrator of child abuse by omission under the [Child Protective Services Law]." *Id.* at 846.

In the instant matter, the evidence does not support the conclusion that Stepmother "perceived, but purposely ignored," the "real possibility" that Child would ingest Seroquel, Wellbutrin, and Flexeril. *S.H.*, 228 A.3d at 28. To the contrary, Stepmother testified that she believed they were "just antidepressants [and] . . . not something that usually someone takes to overdose on," and this testimony was credited. N.T. 151. Stepmother's knowledge that Child had ingested Klonopin and her acknowledgement that Child "may be getting into things that [he] shouldn't be" did not demonstrate that Stepmother made a conscious decision to expose Child to a "substantial" risk of bodily injury from Seroquel, Wellbutrin, and Flexeril. N.T. 160-61.

Further, when Child ingested Klonopin, Stepmother immediately secured the remaining Klonopin pills, and Father removed them from the house. Child was receiving psychiatric therapy, and the therapist who saw Child the day he took the Klonopin did not notice anything "off" with Child. Taken as a whole, the evidence did not demonstrate that Stepmother's conduct grossly deviated from what a reasonable person would do in the same circumstances. As in *S.H.*, 228 A.3d 22, Stepmother took precautions to address risks to Child that she did perceive.

In sum, the record does not support the legal conclusion that Stepmother acted recklessly by not collecting and removing the prescription medications from the house. We reverse the Department's adjudication and remand with the direction that the Department expunge Stepmother's indicated report from ChildLine.

_____
MARY HANNAH LEAVITT, President Judge

12

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.M.K.,                              :
                    Petitioner       :     **CASE SEALED**
                                     :
        v.                           :     No. 1590 C.D. 2019
                                     :
Department of Human Services,        :
                    Respondent       :

# **O R D E R**

AND NOW, this 23rd day of October, 2020, the order of the Department of Human Services (Department), Bureau of Hearings and Appeals, dated October 1, 2019, is hereby REVERSED, and the above-captioned matter is REMANDED with the direction that the Department order the expunction of J.M.K.'s indicated report from the ChildLine and Abuse Registry.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.M.K.,                                        :    **SEALED CASE**
                            Petitioner         :
                                               :
        v.                                     :    No. 1590 C.D. 2019
                                               :    SUBMITTED:  May 29, 2020
Department of Human Services,                  :
                            Respondent         :


BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE ELLEN CEISLER, Judge


OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE CEISLER                               FILED:  October 23, 2020

        I respectfully dissent from the Majority's conclusion that J.M.K. did not
commit child abuse because she did not perceive that the prescription medications
left in the home while C.T. (Child) was unsupervised presented a substantial risk.
To the contrary, the record amply demonstrates that J.M.K. knew, or should have
known, of the risk that Child would ingest prescription medications left in the home,
given that he had done so the previous day.  Consequently, I would affirm the
Department of Human Services' (DHS) denial of J.M.K.'s appeal seeking
expungement of her name from the ChildLine and Abuse Registry.

        As stated by the Majority, the facts of this matter are not in dispute.  Child, a
12-year-old boy who suffers from depression, post-traumatic stress-disorder
(PTSD), and attention-deficit/hyperactivity disorder (ADHD), "passed out" on the
couch at home following a session with his therapist.  Certified Record (C.R.) at 240,
262, 266.  Subsequently, Child's father (Father) discovered Klonopin pills in Child's
pockets.  *Id.* at 266.  J.M.K. and Father elected to let Child "sleep it off," rather than

seek medical attention. *Id.* at 162. J.M.K. subsequently discovered Child had researched the effects of Klonopin on a Kindle tablet. *Id.* at 241. When Child appeared groggy the following morning, J.M.K. and Father allowed him to stay home from school, unsupervised. *Id.* at 271. While the remaining Klonopin was removed from the home, several prescription medications – Seroquel, an antipsychotic, Wellbutrin, an antidepressant, and Flexeril, a muscle relaxant – were left in a kitchen cabinet accessible to Child. *Id.* at 285. During the period Child was home unattended, he overdosed on these medications. *Id.* at 212, 284. As a result of this overdose, Child spent several days hospitalized in a medically-induced coma. *Id.* at 211, 217.

Based on these facts, an administrative law judge (ALJ) found that J.M.K. committed child abuse by omission, in violation of the Child Protective Services Law (CPSL).[1] *Id.* at 133. The ALJ noted that J.M.K. was aware Child received therapy due to his depression and ADHD and she was aware Child took Klonopin the night before he overdosed and he had researched the effects of Klonopin on a Kindle tablet. *Id.* Moreover, J.M.K. knew the Seroquel, Wellbutrin, and Flexeril were in the kitchen and Child would be home alone. *Id.* As such, the ALJ concluded that J.M.K. consciously disregarded a substantial risk. *Id.* The ALJ further concluded that J.M.K.'s failure to remove or secure the Seroquel, Wellbutrin, and Flexeril that were easily accessible to Child was irresponsible and careless and constituted a gross deviation from the standard of conduct a reasonable person would observe in the same situation. *Id.* at 134.

Incredibly, the Majority has reviewed these same facts and deemed them insufficient to sustain a finding that J.M.K. committed child abuse by omission,

---

[1] 63 Pa.C.S. §§ 6301 - 6387.

citing this Court's precedent in *S.H. v. Department of Human Services.*, 228 A.3d 22, 28 (Pa. Cmwlth. 2020), in which we concluded that, for purposes of finding an individual culpable of child abuse on the basis he acted recklessly, the alleged perpetrator had to first perceive, and then purposely ignore, the risks to a child that would result from existing hazards or the perpetrator's conduct. In concluding that J.M.K. did not perceive a risk to Child, the Majority relies in part on J.M.K.'s credited testimony that she believed the medications to be "just antidepressants" and "not something that usually someone takes to overdose on." C.R. at 285. While the ALJ credited J.M.K.'s recitation of the "events leading up to the incident," C.R. at 133, the ALJ made no such credibility determination with regard to J.M.K.'s perception of the Seroquel, Wellbutrin, and Flexeril as "just antidepressants." Indeed, the ALJ characterized J.M.K.'s description of those medications as an attempt to minimize the severity of the incident; a rationalization the ALJ found "unconscionable." *Id.* at 134.

The Majority is correct that the standard for establishing recklessness requires evidence that an individual perceived and ignored a risk or deemed it unworthy of regard. *S.K. v. Dep't of Human Servs.*, 206 A.3d 644, 653 (Pa. Cmwlth. 2019). There is no requirement in the CPSL, however, that J.M.K. recognize the precise result that transpired in this case; *i.e.*, that Child would take Seroquel, Wellbutrin, and Flexeril. Under *S.K.*, it is sufficient that J.M.K. perceived a risk that Child would ingest prescription medications and she ignored that risk or deemed it unworthy of regard. Elsewise, applying the Majority's logic, a caregiver who removes a loaded handgun from the home after discovering a child playing with it is not reckless for leaving a loaded shotgun behind, so long as the caregiver did not perceive that the shotgun presented a risk of bodily injury to the child.

Moreover, a caregiver can be deemed a perpetrator by omission if she "knew or should have known of the significant risk" to the child and failed to take protective measures. *R.W. v. Dep't of Human Servs.*, 128 A.3d 839, 845 (Pa. Cmwlth. 2015). In *R.W.*, we reversed an order of DHS denying a similar expungement request because there was no evidence the mother knew or should have known her deceased child's father posed a risk to the child. Such circumstances do not exist here.

There is no dispute J.M.K. was aware Child ingested Klonopin, a prescription medication that was not his, leaving Child in an altered state. J.M.K. clearly perceived a risk that Child might do so again, given that the remaining Klonopin was removed from the home the day after Child took it. J.M.K. acknowledges in her principal brief that, prior to ingesting Klonopin, Child "had never misused or taken a prescription medication that was not his . . . ." J.M.K. Br. at 21. By leaving Child wholly unsupervised the morning after he did just that, and while groggy from the effects of that prescription medication, J.M.K. ignored a substantial risk that Child would ingest other prescription medications that J.M.K. knew remained in the home. Clearly, in this instance, J.M.K. *should have known* of the significant risk Child would ingest prescription medications, in light of the fact that he had done so not 24 hours earlier.

I must note my further objection to the Majority's conclusion that the evidence fails to demonstrate J.M.K.'s conduct "glaringly" departed from what a reasonable person would do in the same circumstances. I simply cannot dismiss J.M.K.'s actions in leaving a 12-year-old child suffering from depression alone the morning after he ingested Klonopin and while he continued to suffer from its effects. As to that, I can only agree with the ALJ that J.M.K.'s failure to take protective measures by securing the Seroquel, Wellbutrin, and Flexeril was unconscionable and

constituted a gross deviation from the standard of conduct that a reasonable person would observe in the same situation.

For these reasons, I dissent.

_____
ELLEN CEISLER, Judge